IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| United States of America, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 15 CR 18-3 |
| ) | |
| Urvashi Verma, *also known as* ) | |
| Sonia Verma, *also known as* ) | |
| Urvashi Bhushan, ) | |
| ) | |
| Defendant. ) | |

Memorandum Opinion and Order

Before me is defendant Sonia Verma's motion to suppress directed to the contents of a package that United Parcel Service personnel opened and inspected after being alerted that federal agents were interested in it. For the reasons that follow, I deny the motion.

I.

Ms. Verma is one of several defendants alleged to have participated in a scheme to export and import "defense articles" to and from China without first obtaining the necessary licenses or approvals from the Directorate of Defense Trade Controls. *See generally* 01/13/2016 Superseding Indictment. Relevant here is the government's charge that on or about January 19, 2010, Ms. Verma attempted to send a defense article via UPS to a manufacturer in China. Prior to shipment, however, the package

containing the defense article was opened by UPS security representative Robert Gilbert, who then turned it over to Special Agent Calvin Sigur of the Department of Homeland Security and Special Agent Patrick McCurry of the State Department's Office of Inspector General. At the time, these agents were investigating Ms. Verma's co-defendant, Vibgyor Optical Systems, Inc., and several members of the Verma family, including co-defendant Bharat (Victor) Verma.

In her motion, Ms. Verma argues that Mr. Gilbert was acting as an agent of the government at the time he opened the package in question, and that his warrantless search of its contents violated the Fourth Amendment. On February 16, 2017, I held an evidentiary hearing, at which Special Agents Sigur and McCurry testified, as did Mr. Gilbert and an individual named David Prang, who at the time was employed at the UPS store in Arlington Heights, Illinois, where Ms. Verma dropped off the package for shipment.

Agent McCurry testified that in the late morning on January 20, 2010, he visited the Arlington Heights store at Agent Sigur's request to "check on a package" at the store. Tr. of 2/16/2017 Hr'g. at 10:10-13. Agent McCurry stated that his purpose was "[t]o see who the package was from and who it was addressed to. And to the extent that I could tell form the packaging, what it was." *Id*. at 11:6-8. He denied having any

2

intention of opening the package and stated that he did not, in fact, open it. *Id*. at 11:9-11, 13:13-14.

At the UPS store in Arlington Heights, Agent McCurry spoke with the store's owner, Ron Levin, and its employee, David Prang. Agent McCurry viewed the package, noting the addressee and return address. After concluding that he "had no reason to seize it or to open it," Agent McCurry asked Messrs. Levin and Prang "to just send the package as they would normally." *Id*. at 14:20-23. Agent McCurry stated that he did he instruct or ask anyone at the UPS store to open the package. *Id*. at 14:3-18.

David Prang testified that in late 2009 or early 2010, a federal agent visited the Arlington Heights UPS store and left his business card with Messrs. Levin and Prang, asking them to call him the next time they got any packages from Vibgyor. Hr'g. Tr. at 101:15-102:8. Prang testified that he and Mr. Levin followed these instructions after Ms. Verma brought a package to the store on January 20, 2010, with Mr. Levin calling the agent who had left his card. Mr. Prang recalls that two agents then came out to the store.[1] *Id*. at 103:14-19. The agents did not ask Mr. Prang to open the package, nor did he hear the agents ask Mr. Levin to open it. *Id*. at 106:18-20. Indeed, no one contends

---

[1] Neither side makes anything of the discrepancy between Agent McCurry's testimony that he visited the UPS store alone and Mr. Prang's recollection of two agents, and I draw no inferences from the discrepancy.

that the package was opened while at the UPS store in Arlington Heights.

Prior to Agent McCurry's visit to the Arlington Heights store, on January 14, 2010, Agent Sigur contacted UPS's security specialist at its Palatine, Illinois facility, Mr. Gilbert, "regarding a person or persons illegally exporting sensitive military technology to China." UPS Investigation Report, Gov't. Exh. 4, at 2. Agent Sigur provided Mr. Gilbert with a residential address, nearby UPS stores, and several names associated with defendants, and "asked if Gilbert could find any pattern of pkgs going to or coming from China." *Id*. At the hearing, Mr. Gilbert testified about the case file he generated as a result of Agent Sigur's phone call, which he reviewed the week before the hearing, and which refreshed his recollection about the events. Hr'g. Tr. at 56:1-14. Tr. Specifically, he identified his own handwritten notes that read, "all Int[ernational] for these accts needs to be checked by security," followed by two account numbers. *Id*. at 9; Tr. of 2/16/2017 Hr'g., 56:23-25. Mr. Gilbert stated that he took the same information "down to the international where we process international packages. And I let the supervisor know that any shipments for these accounts going to China I needed to take a look at." Hr'g. Tr. at 57:4-9. By "take a look at," Mr. Gilbert meant "checking the customs paperwork, checking the manifest and

4

checking the contents to make sure that they match the customs paperwork." *Id*. at 57:11-13. Mr. Gilbert testified that the reason he intended to take these steps was "[b]ecause we do not move prohibited or illegal items through our system; or we try not to, anyway." *Id*. at 58:1-2.

In this connection, Mr. Gilbert explained that in his role as a UPS security representative—a position he has held for about fourteen years—he opens packages being shipped through UPS "almost daily." Hr'g. Tr. at 60:10-15. The reasons range from damage issues to suspicions that the packages may contain stolen or illegal items. *See id*. at 60:17-61:21. Mr. Gilbert explained that in some cases, UPS receives "a tip that there may be a package containing narcotics coming through," in which case UPS employees "pull the package aside" and call law enforcement, whose agents normally respond by bringing a drug-detection dog to sniff the package. *Id*. at 62:12-16. The reason UPS contacts law enforcement in such cases, Mr. Gilbert reiterated, is that "we do not transport prohibited or illegal items." *Id*. at 63:6.

With respect to the package at issue, Mr. Gilbert testified that on January 20, 2010, he received a second call from Agent Sigur informing him that one of the individuals under investigation for illegal export activity had dropped off a package for shipment to China at a UPS store in Arlington Heights. *Id*. at 58:24-59:7; Gov't. Exh. 4 at 2. Mr. Gilbert

5

testified that he then "went down and told the international area supervisor that if there were any internationals from that one specific UPS store now that we had narrowed it down that I wanted to take a look at them." *Id*. at 60:4-7. He then "received a call that there was one package going to China that was located," and went to collect the package *Id*. at 60:8-9, 63:20-23.

Mr. Gilbert returned with the package to the security office, where he opened the package and checked the contents. *Id*. at 66:23-67:5. Mr. Gilbert testified that he did not inform Agents Sigur or McCurry that he was going to open the package, nor was anyone from the government present when he did so. No one from the government asked Mr. Gilbert to open the package *Id*. at 57:17-18, 59:19-24. Mr. Gilbert further denied that Agent Sigur offered him any reward for opening the package or threatened him with any negative consequences if he did not open the package. *Id*. at 59:22-60:2. The reason he opened it, Mr. Gilbert testified, was "[t]o make sure that there [was] nothing prohibited or illegal in it." *Id*. at 67:16-18.

Upon opening the package, Mr. Gilbert found two parts he described in his investigation report as "metal washer-type parts." Gov't. Exh. 4 at 2. At the hearing, however, Mr. Gilbert testified that the items did not appear to be what he "envisioned aluminum washers to be," and that he would not

6

describe the items he found in the package as washers. Hr'g. Tr. at 70:22-25; 72:6. He went on to explain that after opening the packages, he contacted Agent Sigur because "[a]t that point I felt that there may have been some fraud going on here, so I contacted...to let him know that I had what could be what he was looking for. But my basic concern was that it did not seem to jive (sic) with the export paperwork." *Id*. at 72:17. That paperwork identified the goods as "[t]wo pieces of aluminum washer." *Id*. at 70:1. Agents Sigur and McCurry then went out to UPS's Palatine facility, where Mr. Gilbert showed them the package and its contents. *Id*. at 74:8-16. The agents then seized the package.

The record reflects that in or around September of 2015, Special Agent Amber Wigant, who succeeded Agent Sigur as case agent, wrote an investigation report "to clarify details of the seizure from UPS in January 2010." Exh. 9 to Pl.'s Mot., at 1. According to that report, "SA Sigur stated that at no time did he instruct UPS to open or otherwise inspect the package and that Mr. Gilbert opened the package as part of their routine inspections." *Id*. at 3.

## II.

"It is axiomatic that the Fourth Amendment does not apply to private entities." *United States v. Koenig*, 856 F.2d 843, 846 (7th Cir. 1988). Accordingly, a wrongful search by a private

7

party does not violate the Constitution unless the private party was acting "as an instrument or agent of the state." *Id*. (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971). The resolution of Ms. Verma's motion thus turns on whether Mr. Gilbert was acting as the government's instrument or agent when he opened the package she delivered to the UPS store.

The Seventh Circuit examines "two critical factors" in the "instrument or agent" analysis: "whether the government knew of and acquiesced in the intrusive conduct and whether the private party's purpose in conducting the search was to assist law enforcement agents or to further [its] own ends." *United States v. Shahid*, 117 F.3d 322, 325 (7th Cir. 1997). "Other useful criteria are whether the private actor acted at the request of the government and whether the government offered the private actor a reward." *Id*. The inquiry is "highly factual" and "must be made on a case-by-case basis and in light of all the circumstances." *Koenig*, 856 F.2d at 847 and n. 1. It is the defendant's burden to prove, by a preponderance of the evidence, that the private party acted as a government instrument or agent. *U.S. v. Feffer*, 831 F.2d 734, 739 (7th Cir. 1987).

Applying these factors to the record here, I conclude that Mr. Gilbert was acting as a private individual, not as a government instrument or agent, when he opened the package. There is no evidence that any government agent explicitly

directed or asked Mr. Gilbert (or Messrs. Levin or Prang) to open the package. Ms. Verma concedes as much. Hr'g. Tr. at 164:22-23 ("I don't think there is anything on this record to say it's an explicit instruction."). She argues, however, that the record supports "a very clear wink, wink, nudge, nudge," *id.,* which I take to mean that in her view, the record suggests that the agents had an implicit understanding with Mr. Gilbert that he would open the package—something the agents knew they couldn't themselves do without a warrant—and turn its contents over to them for purposes of their investigation.

In this connection, Ms. Verma insists that the only plausible interpretation of the record is that the government not only acquiesced in the search but actually "induced" Mr. Gilbert to act, and that "by calling [Mr. Gilbert] up and flagging that there was a particular package heading his way...there was no doubt in Agent Sigur's mind he was going to open that package." Hr'g. Tr. at 166:1-4. While I agree that the record supports that inference, Agent Segur's desire, expectation, or hope that Mr. Gilbert would open the package does not, without more, turn Mr. Gilbert into a state agent. Indeed, the law of this circuit is clear that "some exercise of governmental power over the private entity" is needed to transform Mr. Gilbert's search into state action. *Shahid*, 117

9

F.3d at 326 (quoting *Koenig*, 856 F.2d at 849). There simply is no evidence here that the government exercised such power.

Ms. Verma also highlights the government's 2015 investigation report in which Agent Sigur reportedly described Mr. Gilbert's search as a "routine inspection" and omitted any mention of his own role in flagging the package. Exh. 9 to Pl.'s Mot., at 3. I agree that this characterization is belied by other evidence, and that the only reasonable inference is that Agent Segur's January 20, 2010, phone call was the event that triggered Mr. Gilbert's decision to track down and open the package. Nevertheless, I am persuaded that once the package was flagged as potentially containing an item not legal for transport, Mr. Gilbert had an "independent motivation for conducting the search," which was to fulfill his professional duties and to protect his employer's interest. *U.S. v. Feffer*, 831 F.2d 734, 740 (7th Cir. 1987).[2]

Mr. Gilbert testified credibly that a routine part of his job was to open packages suspected of containing "prohibited or illegal items," *id.* at 60:10-61:3; 58:1-2, and that he opened the package Ms. Verma delivered to the UPS store to ensure that it complied with UPS's policy of not transporting such items.

---

[2] To the extent Ms. Verma points to this evidence to suggest that Agent Sigur characterized the search as "routine" in hopes of hiding his own involvement, knowing he had overstepped his bounds, I find that the record as a whole does not support that inference.

*Id*. at 67:16-17. That Mr. Gilbert also wanted to assist the government in its investigation did not transform him into a government agent. As the court explained in *Shahid*:

> A private citizen might decide to aid in the control and prevention of criminal activity out of his or her own moral conviction, concern for his or her employer's public image or profitability, or even desire to incarcerate criminals, but even if such private purpose should happen to coincide with the purposes of the government, "this happy coincidence does not make a private actor an arm of the government."

*Id*. (quoting *Koenig*, 856 F.2d at 850-51). Indeed, "it is every citizen's civic duty to do what he can to aid in the control and prevention of criminal activity, and 'it is no part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals.'" *Koenig*, 856 F.2d at 850 (quoting *Coolidge* 403 U.S. at 488). As in *Shahid*, there is no evidence that Mr. Gilbert "strayed from his role" as a UPS security representative when he opened the package, inspected its contents, and turned it over to the government to ascertain the legality of the shipment. 117 F.3d at 326. Indeed, given the nature of the violations charged in this case, it seems unlikely that Mr. Gilbert would have known, without the government's input, whether the shipment complied with UPS's policy of not transporting illegal items.

Ms. Verma also tries to discredit Mr. Gilbert's testimony about the reason he turned the package over to Agents Sigur and McCurry, pointing out that while a government report states that Mr. Gilbert reported finding "two heavy metal objects" in the package, Exh. 2 to Pl.'s Mot., at 2, the total package in fact weighed approximately 2.56 ounces. However, Mr. Gilbert's own, contemporaneous report did not mention weight, and he testified that he did not believe he ever described the objects as heavy. On this point, therefore, I find no inconsistency in Mr. Gilbert's testimony. Ms. Verma also points out that while Mr. Gilbert testified at the hearing that the export paperwork falsely described the contents as aluminum washers, his own report described the items as "washer-type parts." Gov't. Exh. 4, at 2.

I conclude that in light of all of the evidence, the described inconsistency is insufficient to support the inference that Mr. Gilbert lied about why he gave the package to Agents Sigur and McCurry. I credit Mr. Gilbert's testimony that once the agents alerted him to the possibility that the package might contain an illegal export, he took it upon himself to look for and open the package. Then, unable to determine whether its contents were legal for shipment (the "washer-type parts" indeed do not look like ordinary aluminum washers), he called Agents Sigur and McCurry to come look at the parts both out of concern

12

for his employer's interest and to assist the agents in their investigation.

This interpretation of the record, which acknowledges the government's role in flagging the package to Mr. Gilbert, does not support suppression under the law of this circuit. Ms. Verma cites three Seventh Circuit cases, *U.S. v. Feffer*, 831 F.2d 734, 739 (7th Cir. 1987), *United States v. Koenig*, 856 F.2d 843, 846 (7th Cir. 1988), *United States v. Shahid*, 117 F.3d 322, 325 (7th Cir. 1997), in which the court considered whether the suppression of evidence obtained in a private search was appropriate.[3] In each case, the court rejected the defendant's argument that the private individual or entity had acted as a state agent when it conducted the search.

In *Feffer*, the court considered whether an employee was acting as a state agent when she furnished the Internal Revenue Service with documents, some of which she had signed on her employer's behalf, and which she believed reflected fraudulent accounting by her supervisors. After calling the IRS anonymously

---

[3] Ms. Verma also cites *Radunz v. Von Haden*, 286 F. App'x. 314, 316 (7th Cir. 2008), in which the court reversed the district court's dismissal of the plaintiff's § 1983 claim, holding that the complaint adequately pled state action with allegations that a private search was undertaken at the request of a police investigator. In that posture, the court obviously had no factual record before it, and it expressed no opinion on the type of evidence required to establish that the private citizen acted as a government agent.

13

to discuss her concerns, she met with IRS agents repeatedly at her home over a three-month period.

At the first meeting, one of the agents told her that "he could not encourage her to take any documents, but that it was IRS policy to accept documents voluntarily provided." *Feffer*, 831 F.2d at 736. The employee provided the agents with documents, and the agents talked to her about "becoming a numbered informant and about the rewards for which she could apply." *Id*. At a subsequent meeting, to which one of the agents came prepared with a microfilm copier, the employee provided additional documents. *Id*. She later became a "numbered informant" for the IRS (although she was never paid a reward). The court found that the IRS agents had "actively encouraged" the employee to gather and provide them with documents. *Id*. at 740. Nevertheless, because the employee had an "independent motivation" for providing the documents, namely, her "fear of being held liable for her part in the tax fraud," *id*. at 739, the court concluded that she had not acted as the government's instrument or agent.

In *Koenig*, the court held that a Senior Security Specialist for Federal Express was acting as a private party in furtherance of his employer's interests when he opened a package he suspected of containing narcotics, notwithstanding evidence that the Drug Enforcement Agency "may have known of Federal

Express's security search policy." 856 F.2d at 849. Indeed, the court acknowledged "a history of cooperation between [the employee] and Federal Express on the one hand and various law enforcement authorities on the other," which included a meeting at which representatives from the DEA "met with Federal Express personnel to assist in the development of a drug shipper's profile." *Id*. 848. Despite these factors, the court found that the FedEx "acted for its own, private business purposes," and could not be deemed an agent of the state without "some exercise of governmental power" over it. *Id*. at 849.

In *Shahid*, the court rejected the argument that mall security guards were acting as state agents when they stopped, searched, and detained the defendant in the mall security office after one of the mall's tenants called security to report the defendant's suspicious activity. The court found that although the security guards ultimately intended to turn the defendant over to local law enforcement, their independent purpose of securing the mall's patrons and employees was sufficient to establish that they acted as private individuals. 117 F.3d at 325. In this connection, the court noted that "even if the sole or paramount intent" of the security guards was to assist law enforcement, *Koenig* requires some exercise of governmental power to transform private action into a state search.

It is true that in each of the foregoing cases, the private citizen developed a suspicion of illegal activity before approaching the government, whereas in this case, there is no reason to believe that Ms. Verma's package would have caught Mr. Gilbert's attention had it not been for Agent Sigur's overtures. But the distinction does not compel a different outcome here, since regardless of what triggered Mr. Gilbert's suspicions, his testimony establishes that he had an independent motivation to open the package, while the record contains no evidence that the government exercised control over his action.

Finally, Ms. Verma cites *United States v. Souza*, 223 F.3d 1197 (10th Cir. 2000), but the conduct of Agents Sigur and McCurry cannot meaningfully be compared to that of the agents in that case. In *Souza*, DEA agents were conducting officer training on drug parcel interdiction at a UPS office. While there, one of the agents noticed a suspicious package, set it aside, and later subjected it to a dog-sniff test, which produced a positive alert. 223 F.3d at 1199–1200. The agent then called his office to begin the paperwork for a warrant. In the meantime, two other agents independently approached a UPS employee, showed her the package, told her that a narcotics dog had alerted to it, and suggested that she open it. The employee, who later testified that she was "influenced" by the agents' encouragement, took the package to her desk and began opening it. After she encountered

trouble cutting through the packaging material, "DEA agents intervened using a knife" to help open the package. *Id*. at 1200. On these facts, the "most damning of all" being the agents' substantial assistance in opening the package, the court sensibly concluded that search was indeed "orchestrated by the government." *Id*. at 1202. There is nothing remotely approaching this level of government involvement in this case.

I have reviewed the remaining cases Ms. Verma cites and conclude that none supports suppression on the facts here.

### III.

For the foregoing reasons, the motion to suppress is denied.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: March 2, 2017