**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 15 CR 18-3 |
| v. | |
| URVASHI VERMA | Hon. Elaine E. Bucklo |

**URVASHI VERMA'S**
**SENTENCING MEMORANDUM**

As district courts in other unlawful export cases have found, the Guideline applicable here offers a one-size-fits-all approach that provides essentially no useful guidance as to an appropriate sentence. After careful consideration of the aggravating and mitigating circumstances specific to Ms. Verma, U.S. Probation has recommended a sentence of four years' probation. For the reasons set out below, Ms. Verma agrees with Probation's analysis.

Ultimately, whatever sentence the Court determines to be appropriate, the most salient reality for Ms. Verma will be this: She is now a convicted felon. That reality will restrict her future opportunities and shadow her for the rest of her life. Because her conviction, along with the recommended sentence of probation, will be sufficient, but not greater than necessary, to serve the purposes enumerated in § 3553(a), Ms. Verma respectfully requests that the Court impose that recommended sentence, with any additional conditions the Court deems warranted.

## I.     The Sentencing Guidelines Do Not Provide Rational Guidance In This Case.

Ms. Verma's advisory guidelines range is driven by U.S.S.G. § 2M5.2, as made applicable by U.S.S.G. § 2X1.1. In this case, the advisory range does not provide meaningful guidance for determining a just and reasonable sentence.

Other guidelines provisions have been criticized for employing overly crude measures of seriousness (*e.g.*, loss amount or drug quantity). Section 2M5.2 more or less abandons the effort altogether. Other than a carve-out (for offenses involving not more than two non-fully-automatic small arms) that is inapplicable to the vast range of conduct falling within its ambit, § 2M5.2 establishes a single base offense level (26) for everything else. That is the same base offense level applicable to crimes involving the evasion of "controls relating to the proliferation of nuclear, biological, or chemical weapons or materials." *See* U.S.S.G. § 2M5.1(a)(1). It is the same base offense level applicable to those convicted of providing material support to designated foreign terrorist organizations. *See* U.S.S.G. § 2M5.3.[1]

---

[1] This history of § 2M5.2 shows that it is not based on empirical data and national experience. As originally promulgated, § 2M5.2 reserved its highest offense level (at that time, 22) for offenses involving "sophisticated weaponry" and otherwise prescribed a base offense level of 14. In 1990, with little commentary, the violations eligible for this lower offense level were narrowed to those involving not more than ten "non-fully-automatic small arms." U.S.S.G. App. C, Vol. I, Amend. 337 (Nov. 1, 1990). The only reason offered for the amendment was "to better distinguish the more and less serious forms of offense conduct covered." *Id.* In 2001, apparently as a tag-along to a similar amendment to § 2M5.1, § 2M5.2 was amended to increase the higher base offense level from 22 to 26. *See* U.S.S.G. App. C, Vol. II, Amend. 633. In its across-the-board nature, the amendment went beyond the proffered reason for it: to respond to "a sense of Congress that guideline penalties are inadequate for certain offenses involving the importation and exportation of nuclear, chemical, and biological weapons, materials, or technologies." *Id.* This history, which underscores the arbitrary nature of the Guideline, and the lack of empirical data supporting it, provides additional reason to give no weight to the advisory range it generates here.

Not surprisingly, given that the Sentencing Commission fashioned § 2M5.2 as a blunt instrument, sentences well below the advisory range are, as shown below, relatively common in arms export cases, and probationary sentences are far from unprecedented. *See infra* at 13-26. That is true without regard to whether a particular case is deemed to satisfy the specific grounds for departure set forth in the application notes to §2M5.2. Here, given the mitigating factors discussed below, including the limited "degree to which the violation threatened a security or foreign policy interest of the United States," the undersigned respectfully submits that a substantial departure from the base offense level would be warranted. *See* U.S.S.G. § 2M5.2, application note 2. That was the approach Judge Darrah took, for example, in *Sevilla*, also discussed below. *See United States v. Sevilla*, No. 04 CR 171, 2006 WL 3486872, at *3 (N.D. Ill. Nov. 29, 2006) (departing downward 14 levels from base offense level under § 2M5.1(a) based on conclusion that "a term of imprisonment of 51 to 63 months is inconsistent with sentences among defendants with similar records who have been found guilty of similar conduct").

That said, the Seventh Circuit has instructed that *Booker* "made departures obsolete. The Guidelines are no longer binding; judges can use their own philosophies." *United States v. Townsend*, 724 F.3d 749, 751 (7th Cir. 2013). Accordingly, in requesting the probationary sentence recommended by U.S. Probation, the discussion below focuses on the exercise of the Court's discretion under § 3553(a). [2]

---

[2] Ms. Verma's only objection to the Presentence Investigation Report involves a request for clarification in paragraph 21. That paragraph of the PSR includes the following

## II.  The Section 3553(a) Factors Weigh In Favor Of A Sentence Consistent With U.S. Probation's Recommendation.

Consideration of the § 3553(a) factors confirms that the sentence recommended by U.S. Probation is "sufficient, but not greater than necessary," to serve the statutorily enumerated purposes of sentencing. *See* 18 U.S.C. § 3553(a).

### A.  The Nature and Circumstances of the Offense

There is no denying the seriousness of the offense of which Ms. Verma now stands convicted. That said, there are a number of mitigating circumstances that take this matter outside what might be thought of as a more typical unlawful export case.

#### 1.  *There was no intent to transfer to a foreign end user, to aid a foreign adversary, or to harm the United States.*

In this case, there was no intent to transfer defense articles to a foreign end user. In other words, although the transmission of drawings or sample parts to China met the definition of "export" under AECA, there is no evidence that Ms. Verma had any intent to enable the Chinese government, or any other foreign party, to possess or develop military items for its own use. Nor does the government claim that Ms. Verma's motivations were political or ideological. There is no reason to believe that Ms. Verma sought to aid a foreign adversary, to harm the United States, or to further some larger political, ideological, or criminal objective. Rather, the government prosecuted the case on the theory that the defendants arranged for

---

sentence: "The defendant purchased one sample of the part from another U.S.-based manufacturer in order to obtain a good example of a properly manufactured part." In context, it is clear that the intention was to reference co-defendant Bharat Verma. Ms. Verma requests that the PSR be revised accordingly.

items to be manufactured in China to enhance the margins on sales to U.S. government contractors. That is not to take issue with the jury's finding that the offense conduct involved the export and import of defense articles under the applicable statutes and regulations. But this is not like those cases, for example, where a defendant agrees to sell sensitive military technology to someone she or he believes to be procuring it for the armed services of another country.

Moreover, as U.S. Probation noted in its sentencing recommendation, and without gainsaying the seriousness of any violation of the arms export control laws, it does not appear that the information at issue in this case is "of such great sophistication that its disclosure to China would seriously jeopardize United States military secrets or give China a greater technological or tactical advantage over the United States." (Sent. Rec. at 2.)[3] The undersigned respectfully submits that the evidence at trial tended to confirm that observation. The parts as to which the government presented expert testimony (including spacers, bushings, washers, and the like) are different in kind from the more sophisticated items (such as

---

[3] With regard to quality deficiency issues raised by the government, U.S. Probation offers the following well-founded observations: "[T]he government has provided no basis for comparison, *i.e.*, the number of rejections or field failures of identical or similar parts supplied by legitimate manufactures. In fact, the government acknowledges that, although thousands of parts and materials manufactured in China made it into the supply chains for end-use and items used by the military[,] and quality-deficient part[s] could have been utilized in the field, the quality of all these items remains unknown, in part, because quality review was done on a random basis." (Sent. Rec. at 2-3.)

accelerometers and gyroscopes) that are often the subject of unlawful export cases, representative examples of which are discussed below. *See infra* at 21-26.[4]

> 2. *In the particular circumstances of this case, the role of Ms. Verma's father is a mitigating factor.*

In considering both the nature and circumstances of the offense, and Ms. Verma's history and characteristics, it is impossible to overlook the familial origins of the conduct at issue. As the Court is well aware, Ms. Verma's father and co-defendant, Bharat Verma, an optical engineer by training, was the founder and president of Vibgyor—a business he started in 1987, when Ms. Verma was thirteen years old. (PSR at 7, ¶ 19; *see also* Govt's Version at 2.) Ms. Verma's brother also came to play an important role at the company. (PSR at 9, ¶ 29.) While in no way diminishing her personal responsibility for her own decisions, it does not seem controversial to posit, along with U.S. Probation, that Ms. Verma's "involvement in said conspiracy was a function of her employment relationship with her father, Bharat Verma." (Sentencing Rec. at 4.)

This family dynamic is relevant to sentencing in at least two respects. First, while it does not excuse Ms. Verma's conduct, it puts it in some context. At a minimum, the fact that Vibgyor was a family business underscores that Ms. Verma did not independently initiate or gravitate toward criminal conduct. Put another way, had her father not established Vibgyor, there is no reason to think that Ms. Verma would have engaged in unlawful activities.

---

[4] The Court will recall that, as a result of the regulatory process known as export control reform, a majority of those parts had been moved from the U.S. Munitions List to the Commerce Control List by the time of trial.

Second, in the specific circumstances here, the family origins of the offense conduct (along with the other personal characteristics discussed below) provide additional grounds to conclude that the risk of recidivism is essentially non-existent. Of course, Ms. Verma's conviction will preclude her future involvement in defense contracting. But beyond that, as U.S. Probation points out, Vibgyor is now defunct, and Ms. Verma is estranged from her father. As discussed further below, having recently obtained a journalism degree Northwestern, Ms. Verma has turned her life in a new professional direction that is not centered on her family.

## B.    Ms. Verma's History and Characteristics

Based on Ms. Verma's personal characteristics, there is every reason to believe that Ms. Verma will make a positive contribution to society in the future. As attested to in the letters of support to the Court, Ms. Verma has a generous spirit, demonstrated in her commitment to the less fortunate (evidenced by her volunteer work at homeless shelters over many years) and to the larger community—a commitment that predates this case.[5] The letters, from people who have known Ms. Verma over many years in different contexts, ring true—both in their evident sincerity on an individual level and in the collective portrait they paint of Ms. Verma. "Her character and profound sense of loyalty to the community and everyone around her is deep-rooted." (Letter of Rubina Nguyen.) "She has attended weekly religious services for decades and has committed herself to being an honest person with good faith who tries to embody spiritual values and help improve her

---

[5] Letters of support from the following have been provided to U.S. Probation for submission to the Court: Rubina Nguyen; Sirmista Patel; Bhailal M. Patel; and Vishnu C. Mohan.

community. For many years, she volunteered at a women's shelter providing food and other goods. She is always finding ways to support people who have been affected by disasters globally." (Letter of Shirmista Patel.) "Urvashi has supported many of our temples and community organizations not just professionally but also on a personal level through her volunteer work. She has a good heart." (Letter of Bhailal M. Patel.) The letter from Vishnu Mohan describes Ms. Verma's volunteer activities at homeless shelters, over many years, in terms that make clear her genuine concern for the shelter's guests.

Ms. Verma's desire to pursue a career in journalism springs from this same interest in contributing to the larger community. "During her work as a community editor," according to Mr. Patel, Ms. Verma's supervisor at News India Times, where she worked before pursuing journalism studies at Northwestern, Ms. Verma "brought attention to important social and political issues impacting the Indian diaspora, as well as Indians back home."

At the same time, the letters provide some measure of insight into factors that may have contributed to the regrettable choices that have brought Ms. Verma before this Court. Ms. Nguyen, who has known Ms. Verma for 23 years, offers the following window into Ms. Verma's character and formative influences:

> One of Sonia's strongest trait[s] is her unquestioning loyalty and her profound sense of duty . . . not only to her parents, friends, employers but most of all, to the community. Every time someone has reached out to her for help, Sonia has come through and often without questioning, she has done what's being asked of her. Her upbringing in a traditional immigrant family has heavily influenced the way she approaches any task given to her by her elders.

8

Again, while Ms. Verma's sense of duty to the larger community abides, this case has irrevocably severed the family influences that contributed to the conduct underlying the offense of conviction. Moreover, the focus of the government's case as to Ms. Verma was conduct that occurred in 2010 and earlier. Therefore, in considering Ms. Verma's personal history and characteristics, the Court has the advantage of being able to evaluate her behavior and personal evolution over the many years subsequent to the conduct underlying her conviction. *Cf. United States v. Neuendank*, No. 02 CR 1079, 2004 WL 419915 (N.D. Ill. Feb. 23, 2004) (Kennelly, J.) (pre-*Booker*, holding that court could grant downward departure based on rehabilitative efforts pending delayed initiation of prosecution).

In the past three and a half years since this case was indicted, Ms. Verma has complied with her release conditions and continued to pursue a positive direction in her life. While on pretrial release, she obtained a master's degree in journalism from the Medill School at Northwestern University. (PSR at 21, ¶ 108(iv).)[6] (As the Court will recall, it permitted Ms. Verma to travel abroad on at least two occasions in connection with her studies.) Samples of articles Ms. Verma authored as a student journalist, submitted as Exhibit 1 to this memorandum, show that Ms. Verma pursued those studies with a sense of purpose. Ms. Verma understands that her status as a convicted felon will limit her career opportunities. Nevertheless, she is passionate about journalism, and feels strongly that she can make a positive contribution to society by pursuing it as a profession. She is

---

[6] In the several years between that underlying conduct and the indictment, and continuing into the present, Ms. Verma has also continued to support herself as a realtor. (PSR at 21, ¶ 111.)

determined to pursue her chosen career, even if only on a freelance basis for the foreseeable future, and (as will be discussed further at sentencing) has put concrete plans in place to do so to the extent the sentence imposed will allow.

Ms. Verma's successful pursuit of a degree in journalism degree and her determination to pursue that profession are relevant to sentencing in a number of ways. They are further evidence that she has separated herself from the family associations and patterns that contributed to the offense conduct. Accordingly, they further buttress U.S. Probation's determination that Ms. Verma does not present a risk of recidivism. Ms. Verma's career aspiration also underscores the weight of a felony conviction for her. For the rest of her life, she will live, personally and professionally, with the restrictions, burdens and stigma of being a convicted felon. In this case, to say that a felony conviction is in itself substantial punishment is not to recite a mere truism.

### C. The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment

Ms. Verma has no prior criminal history and will now have a federal felony conviction. As just discussed, that felony conviction, in and of itself, is grave punishment for Ms. Verma. Moreover, in considering the extent to which the purposes set out in § 3553(a)(2)(A) have been served, Ms. Verma's sentencing does not take place in a vacuum. Ms. Verma's father and Vibgyor have also been convicted, their business is defunct, and the family has been shattered.

To be clear, in making these observations, the undersigned does not intend to suggest that these consequences are unjust or merit sympathy. Rather, the point is

that Ms. Verma will be subject to significant punishment even absent a custodial sentence. And the probationary sentence that U.S. Probation has recommended would impose further meaningful punishment beyond the lifelong burden of a felony conviction and the collateral impacts of this prosecution. To be sure, "custodial sentences are qualitatively more severe than probationary sentences of equivalent terms." *Gall v. United States*, 552 U.S. 38, 48 (2007). Nevertheless, as the Supreme Court recognized in *Gall*, probation imposes a "substantial restriction of freedom" and subjects offenders "to several standard conditions that substantially restrict their liberty." *Id.* Here, U.S. Probation has recommended that, in addition to those standard conditions, Ms. Verma's sentence include 400 hours of community service.

To the extent the Court believes that U.S. Probation's recommended sentence is not sufficiently stringent, there are options short of incarceration. For example, the Court could impose a period of home confinement or home detention, which would restrict Ms. Verma to her residence other than for specified activities such as employment, religious services, medical appointments, and Court-imposed obligations (*e.g.*, community service). (PSR at 30.) *See* 18 U.S.C. § 3563(b)(19). Further, the Court could impose a five-year term of probation rather than the four-year term recommended.

In short, given both the direct and collateral consequences of Ms. Verma's conviction, a significant probationary sentence, with whatever additional restrictions the Court sees fit to impose, will further the goals of retribution and respect for the rule of law.

### D. The Need To Afford Adequate Deterrence and Protect the Public From Further Crimes of the Defendant

For reasons already discussed above, there is every reason to believe that Ms. Verma will henceforth lead a law-abiding life. In addition to her specific circumstances, as a woman over forty years old with a college education and zero criminal history points, she falls into a number of categories that, statistically speaking, point to a low risk of recidivism. *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 23 (Ex. 4), 28-29 (Exs. 9, 10) (May 2004). A custodial sentence simply is not needed to deter Ms. Verma specifically or to "protect the public from further crimes" on her part. Indeed, to its credit, the government implicitly recognized as much by not opposing Ms. Verma's requests, while on pretrial release, to spend substantial time abroad, first for school-related travel to Japan and then for a three-months'-long internship in Israel.

With regard to general deterrence, there is little reason to believe that a term of incarceration for Ms. Verma will have a marginal impact over and above the prosecution and convictions in this case, including whatever sentence is imposed on Ms. Verma's co-defendants. To the extent this case registers beyond those immediately concerned, the prosecution not only of Ms. Verma, but also of Mr. Verma and Vibgyor, provides ample deterrent to any person who might be tempted to violate the export control laws. To paraphrase the district court in the *Lachman* case (discussed below), "anyone in this area who has considered these proceedings

12

would view all that has happened and the imposition of a sentence on [Mr. Verma and Ms. Verma] as adequate deterrence."

### E. The Need to Avoid Unwarranted Sentencing Disparities

Non-custodial sentences are far from unprecedented in export violation cases generating similar advisory guidelines ranges—even cases that (unlike Ms. Verma's) involve an intent to transfer military technology to foreign end users. Even where custodial sentences are imposed in such cases, they typically fall well below the range suggested by the guidelines. As a general matter, it appears that only in the most egregious cases—involving the specific intent to benefit a foreign adversary, to the detriment of U.S. national security interests, through the transfer of sophisticated technology—are guidelines-like sentences handed out. Accordingly, the probationary sentence requested by Ms. Verma and recommended by U.S. Probation would be entirely consistent with § 3553(a)'s goal of avoiding unwarranted sentencing disparities. Conversely, anything approaching a guidelines sentence in this case *would* result in an unwarranted sentencing disparity within the meaning of § 3553(a).[7]

---

[7] The Justice Department's National Security Division periodically releases a "Summary of Major U.S. Export Enforcement, Economic Espionage, and Sanctions-Related Cases," which is available online. (See https://www.justice.gov/nsd/page/file/1044446/download; https://www.justice.gov/nsd/files/export_case_list_june_2016_2.pdf/download; https://www.justice.gov/sites/default/files/pages/attachments/2014/10/22/export-case-fact-sheet-201410.pdf; http://www.vpc.org/texas/TXCalvilloDOJExportEnforcementReport081028.pdf.)   Unless otherwise indicated, case descriptions below are drawn from those summaries. References to particular docket entries ("Doc. __") are to the docket in the federal case under discussion.

1.   *Examples of Non-Custodial Sentences*

In each of the following cases, the district court imposed a non-custodial sentence notwithstanding offense conduct that involved the transfer or attempted transfer of military technology to a foreign end user, and/or the evasion of important counter-proliferation controls:

***United States v. Ali Mohammadi*, No. 12 CR 591-2 (N.D. Ill.).** Judge Lefkow sentenced Mohammadi (the sole owner of co-defendant Modir Trading) to five years' probation for conspiring to violate the International Emergency Economic Powers Act (IEEPA) by exporting a gyroscope to Iran without a license. The gyroscope in question—a Series 446 Rate Integrating Gyroscope—was a component of the TOW missile, and also had applications in aircraft, ships, tanks, and other weapons systems. Mohammadi's guidelines range was 57 to 71 months' imprisonment, the government recommended "a significant sentence that includes a term of incarceration," and (unlike here) U.S. Probation recommended a sentence of 24 months' imprisonment. (Doc. 100 at 1-2.) Among the aggravating factors cited by the government: an undercover agent warned Mohammadi that the gyroscope was "significant military equipment" requiring an export license; Mohammadi knew that the gyroscope was destined for Iran; the gyroscope had military applications and could not legally be exported to Iran; and although Mohammadi's attempt to procure the gyroscope was limited to one sample, "it was [his] intention that this transaction was to be the tip of the iceberg." (*Id.* at 4-5.) Further, Mohammadi was found to have obstructed justice by making false representations at a suppression

14

hearing (albeit under the influence of counsel exercising questionable professional judgment). (*Id.* at 6; *see also* Doc. 97 at 12-14.) To be sure, unlike Ms. Verma, Mohammadi pleaded guilty, but his case involved significant aggravating circumstances not present here—in particular, (i) relatively sophisticated military equipment, and (ii) the intent to transfer that sophisticated equipment to Iran, a hostile foreign power that is a sponsor of international terrorism.

*United States v. Lachman, et al.*, **No. 93-10193-DPW (D. Mass.).** The two individual defendants in *Lachman* (Lachman and Subilia) were the top executives at corporate defendant Fiber Materials, Inc., a military contractor with 25 years' experience producing composite materials for industrial and aerospace applications. *See United States v. Lachman*, 48 F.3d 586, 588 (1st Cir. 1995); *see also United States v. Lachman*, 521 F.3d 12 (1st Cir. 2008). A jury convicted them of violating and conspiring to violate the Export Administration Act by exporting, without the requisite license, a control panel for a large hot isotatic press (HIP) to India. As subsequently recounted by the First Circuit, the HIP in question could "produce densified material useful for ballistic missiles." 521 F.3d at 15. (The defendants exported the HIP as part of a larger contract with the Indian government's Defense Research and Development Laboratory to "outfit a carbon/carbon facility in India for use in rocket and missile development." 48 F.3d at 588.) For reasons of national security and nuclear non-proliferation, the export of the large HIP, and any component, accessory and control "specially designed" for it, required a license. The jury accepted the government's theory that the control panel "had been 'specially

designed' for the larger HIP and . . . therefore covered by the statute and regulations." 521 F.3d at 15-16. The district court vacated the defendants' convictions on the ground that the regulations were unconstitutionally vague, but the First Circuit reversed and reinstated the guilty verdicts. In 2005, the district court sentenced Lachman to three years' probation, with a year of home detention. Subilia—who obstructed justice by perjuring himself at trial—also received a sentence of three years' probation, with the first six months in community confinement. 521 F.3d at 16. (*See* also Doc. 646, sentencing transcript appended to Judgment ("*Lachman* Tr."), at p.14.)[8]

The government argued in *Lachman* for sentences at the high end of the guidelines range, which it calculated to be 63 to 78 months' imprisonment for Lachman, and 78 to 97 months' imprisonment for Subilia. Although the district court did not entirely accept the government's characterization of defendants' culpability, it bears noting the facts the government cited in aggravation: (i) the defendants were "sophisticated businessmen who have enjoyed longstanding roles as contractors in the United States defense industry" and who "were intimately aware of the military uses to which their 1988 export was likely to be put generally, and specifically in India's AGNI missile program"; the "export was but one component of a much larger scheme which was active from at least 1982 to 1992 and involved the defendants' exports to India from both the United States and Europe, as well as international travel"; and the defendants "took great pains to

---

[8] Because the *Lachman* sentencing transcript is discussed at some length below, it is attached for the Court's convenience as Exhibit 2 to this memorandum.

execute a complex and sophisticated scheme to provide India with its military facility well outside the scrutiny of their own government." (Doc. 618 at 18-21.)

As in almost any sentencing, the particular combination of aggravating and mitigating factors in *Lachman* was idiosyncratic. That said, the sentencing transcript is instructive for what it says about the district court judge's approach to the guidelines at a time when *Booker*'s full implications were still being digested. The court started from the premise that the defendants' conduct was "reprehensible in the most fundamental sense"—"that the defendants here sought for their own private economic advantage and heedless of the national security interests of this country to exploit imprecision in the regulatory regime for controlling exports." (*Lachman* Tr. at 3.) Nevertheless, the court "c[a]me to the conclusion that this is a case that simply falls entirely outside the Guidelines," which "provide only the crudest mechanism for measuring the culpability of the defendants here." (*Id*. at 5, 7.) In particular, the court was convinced that the "potential use of the technology that was transferred and is at issue here for the Indian missile and proliferation program is de minimis and was de minimis." (*Id*. at 9.)

Addressing the goals of general deterrence and respect for the law, the district court framed the question as whether "others similarly situated think that this is a sentence which says 'you've got to obey the law' or is it a sentence that says 'one can take a chance." (*Id*. at 13.) The court concluded that the non-custodial sentences it imposed were adequate to provide general deterrence and promote respect the law:

17

> I am morally certain that anyone in this area who has considered these proceedings would view all that has happened and the imposition of a sentence on these defendants as adequate deterrence. That is to say, it is not necessary to impose a severe incarcerative judgment to obtain as a result of this case and these proceedings an adequate deterrent or general deterrent on others.

(*Id.* at 13.) For reasons articulated above, the undersigned respectfully submits that the same can be said of a probationary sentence in this case.

**United States v. Juan Sevilla, 04 CR 171 (N.D. Ill.).** Judge Darrah sentenced Sevilla to five years' probation, with six months of home detention. In that case, Sevilla entered a "blind" plea in which he admitted violating IEEPA by attempting to sell a hydraulic floor model testing machine and related software, at a total cost of more than $50,000, for ultimate delivery to Iran. *See United States v. Sevilla*, 2006 WL 171039 (N.D. Ill. June 13, 2006); *United States v. Sevilla*, 2006 WL 3486872 (N.D. Ill. Nov. 29, 2006). Based on the charge of conviction, Sevilla's offense level was 24, resulting in a guidelines range of 51 to 63 months' imprisonment. At sentencing, the government stressed that "Sevilla had been attempting to export to Iran for quite some time," that the evidence "demonstrated that he indeed understood the scope of the [Iranian] embargo and knowingly violated it," and that "the equipment and software at issue was technology serious enough to be listed on a 'watch list' relating to nuclear proliferation." (Doc. 44 at 3-4.) The government also noted that Iran (along with Cuba, Libya, Sudan, Syria, and North Korea) was one of six countries the State Department had designated a supporter of international terrorism. (*Id.* at 9.) Nevertheless, Judge Darrah found a number of mitigating factors: the conduct occurred on one occasion and involved

18

"minimal" commerce; there was no evidence of "criminal or terroristic intent"; and, notwithstanding the government's protestations to the contrary, the court determined that the testing machine did not "threaten[] controls relating to the proliferation of nuclear, biological, or chemical weapons." 2006 WL 3486872, at *3. The court also determined that "a term of imprisonment of 51 to 63 months is inconsistent with sentences among defendants with similar records who have been found guilty of similar conduct." *Id.* Accordingly, the court departed downward 14 levels (from 24 to 10) and, as noted, imposed a sentence of five years' probation.

***United States v. John Nakkashian***, **No.** CR 08-00605. Nakkashian was a Vice President for International Sales at Air Shunt Instruments, Inc., a supplier of aerospace parts, many of them defense articles on the U.S. Munitions List. The indictment, which charged four AECA violations, alleged that Nakkashian illegally exported components for the J85 engine used on the F-5 fighter jet, and other military items, to Dubai, United Arab Emirates, and also illegally exported a military gyroscope to Thailand. (Doc. 1.) Nakkashian was arrested after fleeing the country. Nevertheless, he was permitted to plead to a superseding information charging a single § 1001 (false statement) violation (Doc. 32), and the court sentenced him to two years' probation. Nakkashian admitted in his plea agreement that, even though he "was the vice president of Air Shunt responsible for international exports by Air Shunt, and knew that Air Shunt was required to obtain export licenses for USML items, and also knew that Air Shunt was routinely exporting items included on the USML, [he] created no procedures to ensure Air

Shunt applied for export licenses when required to do so." (Doc. 32 at 6-9.) To the contrary, according to the plea agreement, Nakkashian "trained and instructed the Air Shunt employees responsible for filling out [Shipper's Export Declarations] to insert the letters 'NLR'"—meaning "No License Required." (*Id.* at 8.) In doing so, he acted "willfully"—"deliberately, intentionally, and knowingly"—to conceal the fact that an export license was required. (*Id.* at 9.) The court sentenced Nakkashian to two years' probation.

***United States v. Hsien Tai Tsai and Yueh-Hsun Tsai*, 12 CR 829 (N.D. Ill.) (Norgle, J.).** As here, the lead defendant ("Alex" Tsai) was the father of his co-defendant ("Gary" Tsai). Alex Tsai was a Taiwanese resident who operated a number of Taiwan-based machine-tool businesses. The Treasury Department's Office of Foreign Assets Control ("OFAC") had previously designated Alex Tsai and his businesses as proliferators of weapons of mass destruction for their involvement, since the late 1990s, in shipping items to North Korea that could be used to support its advanced weapons program. His son and co-defendant, Gary Tsai, was a legal permanent U.S. resident. The indictment charged them with conspiring to defraud the United States in its enforcement of laws prohibiting the proliferation of weapons of mass destruction; conspiracy to violate IEEPA by seeking to evade restrictions resulting from Alex Tsai's OFAC designation; and money laundering. The father, Alex Tsai, pleaded guilty to conspiracy to defraud the United States and received a sentence of two years' imprisonment. The son, Gary Tsai, pleaded guilty to a superseding information charging him with knowingly making a false bill of

lading. The bill of lading related to a Bryant Center Hole Grinder (a precision machine tool used to grind small center holes with precisely smooth sides) that Gary Tsai purchased for one of his father's businesses. In addition to that transaction, according to the government's sentencing memorandum, Gary Tsai, on various other occasions, "engaged in transactions with his father that were inconsistent with the WMD Sanctions Regulations"—including receipt of wire transfers of $66,975 and $49,975, and other transactions involving the importation of LED road lights and an oil pump into the United States. Gary Tsai received a sentence of three years' probation.

> **2.** *Examples of Substantially Below-Guidelines Sentences in Cases Involving Transfers to Foreign End Users*

Cases involving intentional transfers to foreign end users of items more sophisticated or lethal than the parts at issue in this case often result in sentences well below the guidelines range. For example:

- *United States v. William Ali*, 16 CR 142 (W.D. Wa.). A jury convicted Ali of conspiracy to violate AECA, but the court vacated the conviction based on his counsel's failure to transmit the terms of a government plea offer. Ali then pleaded guilty to the charged conspiracy and was sentenced to 24 months' imprisonment. According to the evidence at trial, Ali attempted to purchase, for export to China, accelerometers on the U.S. Munitions List that are used in spacecraft and missile navigation, as well as gyroscopes designed for military use. Ali paid an undercover agent

$25,000 for the devices before his arrest, when he was discovered with a ticket to Hong Kong and a travel visa to China.

- *United States v. Yue Wu*, 14 CR 306 (W.D. Wa.). Wu pleaded guilty to conspiracy to violate AECA by going through what the government described in its sentencing memorandum as "extensive and surreptitious efforts" to smuggle military-grade accelerometers to China. (Doc. 31 at 2-3.) The accelerometers in question were on the U.S. Munitions List and "were very sophisticated devices . . . developed for low-and zero-gravity inertial navigation systems that are used primarily in spacecraft and satellites. (*Id.* at 3.) The court sentenced Wu to 18 months' imprisonment.

- *United States v. Sam Rafic Ghanem*, 14 CR 0008 (D. Md.). A jury convicted Ghanem of violating AECA and smuggling goods from the United States for attempting to use his own freight forwarding business to export to Lebanon the following firearm parts and accessories, which he planned to conceal in salvaged vehicles: seven 9mm semi-automatic pistols; three .40 caliber semi-automatic pistols; 10 AR-15 .223 caliber semi-automatic rifles; and 18 advanced combat optic gun sights. The court sentenced him to 18 months' imprisonment.

- *United States v. David Ray Kelley*, 13 CR 0588 (D. Md.). Kelley received a sentence of 18 months' imprisonment after pleading guilty to violating AECA. In his plea agreement (Doc. 23), Kelley acknowledged operating a business that sold night vision devices on the U.S. Munitions List

and other military-style items primarily over eBay. He admitted making approximately 60 shipments containing ITAR-restricted weapons parts and night vision devices destined for customers in 24 different countries, including Argentina, Australia, Russia, the Philippines, the United Kingdom, and Japan. He disguised these shipments, for which he collected over $140,000, by falsely labeling them as, among other things, "toys."

- *United States v. Kevin Zhang*, 11 CR 212 (S.D. Cal.). The court sentenced Zhang to time served (approximately eight and a half months) after he pleaded guilty to conspiring to export defense articles in violation of AECA. Specifically, Zhang conspired to export to China gyroscopes with uses in tactical missile guidance and unmanned aircraft systems. According to the indictment, Zhang solicited others in the U.S. to obtain and smuggle defense articles, including the gyroscopes, to China. On behalf of China, Zhang himself allegedly sought to purchase three gyroscopes for $21,000 as a prelude to future purchases.

- *United States v. Mansour Moghtaderi Zadeh*, 10 CR 309 (D.D.C.). Zadeh was sentenced to 18 months' imprisonment for participating, from May 2005 through December 2008, in a conspiracy to smuggle aviation parts and supplies to Iran. Zadeh conducted his export activities through several companies that he formed in Iran and Cyprus, and persisted in the criminal conspiracy even after the Commerce Department issued a

23

Temporary Denial Order prohibiting him (under an alias he had used) from exporting goods from the United States.

- *United States v. Qing Li*, 07 CR 2915 (S.D. Cal.). Li received a sentence of a year and a day after pleading guilty to conspiracy to smuggle military-grade accelerometers from the United States to what her co-conspirator described as a "special" scientific agency China. The accelerometer in question has military applications in "smart" bombs and missile development and in calibrating the *g*-forces of nuclear and chemical explosions.

    3.    *Examples of Multi-Year Sentences Reserved for the Most Serious Efforts to Aid Foreign Adversaries and Harm U.S. National Security Interests*

Generally speaking, sentences approaching the severity suggested by the guidelines appear to be reserved for cases striking at the heart of national security concerns, such as deliberate efforts to transfer to foreign adversaries sensitive technology conferring a military advantage on the United States. For example, in *United States v. Wenxia Man*, 14 CR 60195 (S.D. Fla.), a jury convicted Man of conspiring to export fighter jet engines, an unmanned aerial vehicle (commonly known as a drone), and related technical data to the People's Republic of China, in violation of AECA. According to the evidence at trial, as described in government press releases, between March 2011 and June 2013, Man conspired with a "technology spy" working on behalf of the Chinese military to export to China defense articles that included engines used in the F-35 Joint Strike Fighter, the F-22 Raptor fighter jet, and the F-16 fighter jet, as well as the MQ-9 Reaper/Predator

B Unmanned Aerial Vehicle capable of firing Hellfire Missiles. The government argued in its sentencing memorandum that there could be "hardly a more serious case . . . that involves some of our most sophisticated fighter jet engines and unmanned weaponized aerial drones," as well as the "clear intent . . . to enable the People's [R]epublic of China to reverse engineer" those items in order "to increase its military capabilities and might." (Doc. 139 at 3.) The district court agreed, and Man received a sentence of 50 months' imprisonment. (Doc. 155 at 38-41.)

Other export cases involving similar sentences have tended to be comparably egregious. For example, in *United States v. Su Bin*, 14 CR 131 (S.D. Cal.), the defendant was sentenced to 46 months' imprisonment after pleading guilty to conspiracy to violate AECA and the Computer Fraud and Abuse Act. He admitted participating in a six-year conspiracy to hack into the computer networks of major U.S. defense contractors, steal sensitive military data, and send the stolen data to China.

    4.    *United States v. Calik: Time Served Where Defendant Was Front for Overseas Manufacturers of USML Items Supplied to Defense Department*

The facts in *United States v. Calik*, 15 CR 427 (D.N.J.), provide some parallels to co-defendant Victor Verma (although it is respectfully submitted that the aggravating factors were more substantial in *Calik*). The defendant in *Calik* was a Turkish citizen who owned or co-owned a pair of New Jersey-based corporations that supplied replacement military parts to the Department of Defense. The criminal complaint charged Calik with two counts of mail fraud and one count of violating AECA. (Doc. 1 at 2-4.) The government alleged that Calik's

businesses were merely shell companies set up as fronts for Turkish manufacturers to obtain Department of Defense contracts for which they were ineligible. (*Id.* at 7, ¶ 10.) According to the complaint, between 2009 and September 2014, often from outside the United States, Calik "downloaded approximately one hundred thousand drawings" from the Defense Logistics Agency, several of which were U.S. Munitions List items. (*Id.* at 8, ¶¶ 14-15.) Between July 2010 and January 2013, the Defense Department wired one of Calik's companies approximately $1,378,717 for parts supplied by his company, most of which Calik wired to himself and co-schemers in Turkey. (*Id.* at 9, ¶ 21.)) In at least one instance, parts Calik supplied to the government had dimensional nonconformities and were unusable. (*Id.*, ¶ 20.) The AECA count involved technical data relating to the torpedo tube on the NSSN Class Submarine. Under a plea agreement with the government, Calik pleaded guilty to an information charging him with a single mail fraud count. The district court sentenced Calik to time served (approximately 15 months).

*       *       *

The above examples are obviously not intended to be exhaustive, and undoubtedly cases could be found that do not fit neatly into any discernible sentencing pattern. As noted, however, they confirm that the probationary sentence that U.S. Probation has recommended for Ms. Verma is consistent with the purposes of § 3553(a)(2) and, in particular, would further the goal of avoiding unwarranted sentencing disparities.

## CONCLUSION

Ms. Verma now faces sentencing for conduct that occurred eight years ago or more. In those eight years, she has emerged from the shadow of her father and worked to nourish the positive qualities that have always been part of her character. The offense of which she stands convicted, though serious, did not involve an intent to transfer defense articles to a foreign end user or to harm the United States. She already faces significant, life-long punishment in the form of a felony conviction. The sentence recommended by U.S. Probation will serve the goals of sentencing while preserving Ms. Verma's ability to make a positive contribution to society in the future. Accordingly, Ms. Verma respectfully requests that the Court impose a non-custodial sentence of four years' probation, with any additional conditions that the Court deems just and appropriate.

Dated:  August 2, 2018

Respectfully submitted,

/s/ Dylan Smith
Dylan Smith

FREEBORN & PETERS LLP
311 S. Wacker Dr., Suite 3000
Chicago, IL 60606
(312) 360-6000

*Attorneys for Urvashi Verma*