UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

URVASHI VERMA,
    also known as "Sonia Verma"

No. 15 CR 18-3

Judge Elaine E. Bucklo

## Government's Sentencing Memorandum

Defendant Urvashi "Sonia" Verma served as "Production Manager" for Vibgyor Optical Systems, Inc. and, in that role, she illegally facilitated the manufacturing in the People's Republic of China (PRC) of component parts for United States military equipment that Vibgyor used to fulfill Department of Defense (DoD) contracts. The defendant continued to illegally export sensitive component parts and technical data to the PRC when operating her own firm. The government respectfully requests that this Court sentence the defendant to a term of imprisonment of 30 months, a sentence which is 50% of the applicable advisory Guidelines range.

## I.   Background

The defendant worked at Vibgyor, her family's business, or received payment from the company between at least 2005 and 2010. Vibgyor operated out of the Verma family residence in Arlington Heights, Illinois and promoted itself as a manufacturer and assembler of military equipment. The defendant's father, Bharat "Victor" Verma, was President of Vibgyor. Vibgyor did no manufacturing of its own. For many years, up to about 2010, Vibgyor used a company in China called Universal Optics Manufacturing Company (UOM) to manufacture the parts. The defendant, as a

Vibgyor employee, communicated regularly with UOM about Vibgyor's orders and she maintained Vibgyor's books about how much money Vibgyor owed to UOM for its services.

In June 2005, federal agents conducted a controlled delivery at Vibgyor. Victor Verma consented to a search of the residence and to be interviewed by the agents. The agents returned several days later to return computer equipment seized during the search. The defendant was present when the agents returned. The agents' visits to Vibgyor, and the knowledge it provided to defendant and her family about law enforcement's scrutiny of Vibgyor's business practices, particularly Vibgyor's reliance on the PRC as its manufacturing site, did not prompt the defendant to change the way Vibgyor fulfilled DoD contracts. The defendant continued to participate after June 2005 in the illegal export of items on the United States Munitions List (USML) and the import of items on the United States Munitions Import List (USMIL).

In October 2008, the defendant created her own firm, US International, Inc. (USI), which served as a subcontractor by supplying Vibgyor with component parts under DOD contracts. The defendant continued to work at Vibgyor during the time she operated USI. In 2009, at the time the defendant created USI, the defendant signed a Militarily Critical Technical Data Agreement in order to gain access to technical data on the DLA's cFolders website. The defendant, by signing the agreement, "acknowledge[d] all responsibilities under applicable U.S. export control laws and regulations (including the obligation, under certain circumstances, to obtain

2

an export license from the U.S. Government prior to the release of militarily critical technical data within the United States)…and…agree[d] not to disseminate militarily critical technical data in a manner that would violate applicable U.S. …export control laws and regulations."

The defendant described USI and her role within it in an email set forth below:

We are a provider of military & army optical components and systems based in the US for more than 15 years. We provide optic-mechanical components for M1A1, M36, M19. Please feel free to contact us if you have any requirement for parts.

Best regard,

Sonia Bhushan
Sales Manager

US Int Inc

The defendant, through USI, used a Chinese manufacturer, Xiamen Zhaoxing Mould Company, to manufacture component parts, and she then supplied the Chinese-made parts to Vibgyor. The defendant sent Xiamen samples of component parts and emailed Xiamen the technical data for the parts. The defendant knew that she needed a license to export or import defense articles and that the component parts and technical data she sent to China were subject to export controls. Some of the technical data on cFolders for which the defendant sought bids from Xiamen in China contained export control warnings. The defendant deleted this export control warning (along with information about the data's "original source" and "higher end use") before emailing to Xiamen. The defendant repeatedly sent militarily critical technical

3

data to China without a license in this manner in violation of the Arms Export Control Act despite her knowledge it was wrong to do so.

In 2010, federal agents searched defendant's home and the Arlington Heights family residence and, at the same time, interviewed the defendant and her brother. The defendant recounted the search of her condominium during the hearing on her motion to suppress. But, even after this search of her own home, the defendant failed to extricate herself from the illegal business operations. Instead, the defendant continued to communicate with a PRC-based manufacturer and re-routed items intended for the DoD through India. The defendant continued to profit from her family's illegal conduct for several more years and may continue her ownership interest in the family business to this day. PSR 22.

## II.  Guideline Calculation and Recommended Sentence

The government agrees with the guidelines calculation set forth in the Pre-Sentence Investigation Report. The total offense level is 26 and defendant's Criminal History Category is I. The defendant's advisory Guideline range based on these calculations is 63 to 78 months. The defendant was convicted of one count which carries a statutory maximum sentence of five years and, as a result, her Guideline range is capped at and becomes 60 months' imprisonment.

The government recommends that the Court impose a sentence of incarceration of 30 months—which is 50% of the advisory Guidelines range. A 30 month sentence comports with the statutory directive that the sentence be sufficient,

but not greater than necessary, to comply with the purposes of § 3553(2). The defendant's requested probationary sentence, in contrast, fails to adequately address the severity of her criminal conduct, the potential harm it posed to the security and foreign interests of the United States and the safety of its service members.

## III.   Section 3553 Factors

### A.      The Nature and Circumstances of the Offense

The defendant's criminal conduct was extremely serious, as was its harm and potential for harm to the United States. The defendant and her co-conspirators provided technical drawings for hundreds—if not thousands—of military items to manufacturers in the PRC. The defendant then caused the PRC-manufactured items to be introduced into the DoD supply chain. The defendant has acknowledged the seriousness of the offense ("[t]here is no denying the seriousness of the offense of which Ms. Verma stands convicted," R. 268 at 4) but not the seriousness of her conduct as evidenced by her claim that probation is the appropriate sentence here.

The President, through the Department of State (which seeks the input of the DoD and other stakeholders) is tasked with determining those defense articles and services deemed critical to a security or foreign policy interest of the United States. The items in this case were not classified. But the items in this case were determined to meet this high standard and, as a result, the items warranted protection from dissemination to the PRC. Yet the defendant willfully gave these sensitive military items, and the exact plans as to how to replicate them, to China.

5

The defendant argues that items at issue here, *e.g.*, spacers, bushings, and washers, are different in kind from the "more sophisticated items" that are often the subject of unlawful export cases. R. 268 at 5-6. The items here may be less complicated but they are equally vital to the functioning of military equipment. The equipment into which these parts fit, whether an M1 Abrams tank or a Chinook helicopter, will not function without these items. The apparent simplicity of these items in design does not mean they are any less important to the equipment's operation. The simplicity of these items also does not lessen the harm or potential harm in providing them to the PRC. The fact that the defendant gave PRC manufactures *technical data*, the actual plans for the construction of these items, is critically important when considering the seriousness of the offense. The technical data displayed not only the dimensions of the items but also the specifications for the materials used to construct them and the coatings or the protective surfaces applied to them. This is vital information in the world of military equipment, such as airplanes, where the weight or strength of every object matters in order to make the equipment work. The visual simplicity of the items in this case, then, is a huge misnomer when the items are considered, as they must be, in the context of how the items are used and the significance of revealing their structural details to a prohibited country like the PRC.

6

The defendant stresses that she did not intend to transfer defense articles to a foreign end user. R. 268 at 4-5. But, while that may be a factor to consider, it does not negate or even mitigate to an appreciable degree the seriousness of the defendant's offense. The offense seeks to prevent the release of the sensitive information in the first instance regardless of the defendant's reasons for committing the crime. The harm is caused by the release, not the motivations for it, and the defendant, after all, cannot control the dissemination of the information once the release occurs. *See, e.g., United States v. Al-Balawi*, 2018 WL 1859122 at *4 (N.D. Ind. April 18, 2018) (noting that a defendant has no control over the illegally exported items once they arrive at their (prohibited) destination). The potential for harmful impact is even worse here than in *Al-Balawi*, which involved 20 rifle scopes, because of the volume of technical drawings the defendant sent to the PRC (hundreds) and the number of manufacturing firms to which she and her co-schemers sent them (at least three). The defendant did little to protect the technical data from dissemination. The entirety of the defendant's effort was to ask her PRC manufacturer to "Pls [please] keep all DWGS [drawings] confidential."

The Sentencing Recommendation refers to the harm from the defendant's actions as "hypothetical." But Guidelines Section 2M5.1, which the Probation Office determined to be the applicable guideline in this case, captures both actual and *potential* harm given the sensitivity of the exported information it covers and the dangers created by causing its release. The original Guideline § 2M5.2 was captioned

7

"Exportation of Arms, Munitions, or Military Equipment or Services Without Required Validated Export License" and provided a base offense level of 22 "if sophisticated weaponry was involved," or 14 otherwise. There were two notes in the Commentary section. Note One provided that "[i]n the case of a violation during time of war or armed conflict, an upward departure may be warranted." Note Two provided that, in determining the applicable guideline range, the court "may consider the degree to which the violation threatened a security interest of the United States, the volume of commerce involved, the extent of planning or sophistication, and whether there were multiple occurrences." The note provided that, where such factors were present in an extreme form, "departure from the guidelines may be warranted." From the outset, then, the guideline considered the "sophistication of the weaponry involved" and, as for determining the sentencing range, cited the following factors: (1) degree of threat to a security interest of the United States; (2) the volume of commerce involved; (3) the extent of planning or sophistication; and (4) the existence of multiple occurrences.

Amendment 337 to Guideline § 2M5.2, effective November 1, 1990, modified the base offense levels and the commentary. Guideline § 2M5.2 provided after this amendment that the base offense level was 22 "except as provided in subdivision (2)," and subdivision (2) provided that the base offense level was 14 "if the offense involved only non-fully automatic small arms (rifles, handguns, or shotguns), and the number

8

of weapons did not exceed ten. Application Note One was modified pursuant to Amendment 337 to provide as follows:

> Under 22 U.S.C. § 2778, the President is authorized, through a licensing system administered by the Department of State, to control exports of defense articles and defense services that he deems critical to a security or foreign policy interest of the United States. The items subject to control constitute the United States Munitions List, which is set out in 22 D.F.R. Part 121.1. Included in this list are such things as military aircraft, helicopters, artillery, shells, missiles, rockets, bombs, vessels of war, explosives, military and space electronics, and certain firearms.
>
> The base offense level assumes that the offense conduct was harmful or had the potential to be harmful to a security or foreign policy interest of the United States. In the unusual case where the offense conduct posed no such risk, a downward departure may be warranted. In the case of a violation during time of war or armed conflict, an upward departure may be warranted.

USSG App. C (Amend. 337). The inclusion of the reference to the USML in Application Note One is instructive here and supports the inference that a defendant who exports items on the USML, as did the defendant here, qualify for the higher base offense level of 22 under the guideline.

Application Note Two was modified by Amendment 337 to include "foreign policy interest" in addition to a violation that threatened a security interest of the United States. The amendment changed the language to read: "the court may consider the degree to which the violation threatened a security or foreign policy interest of the United States…." This is also significant here, as the prohibition against exports to PRC of items on the USML constitutes a foreign policy of the

9

United States and defendant acted in direct contravention of this foreign policy by exporting USML items to the PRC without a license.

Amendment 633 to Guideline § 2M5.2, effective November 1, 2001, increased the base offense level under Section 2M5.2(a)(1) from 22 to 26. Appendix C provides the following explanation as the "reason for the amendment":

> This amendment [which also effected Guideline § 2M6.1] responds to a statutory provision expressing a sense of Congress and addresses two offenses relating to biological and chemical weapons. Specifically, the amendment responds to section 1423(a) of the National Defense Authorization Act for Fiscal Year 1997, Public Law 104-201, that expressed a sense of Congress that guideline penalties are inadequate for certain offenses involving the importation and exportation of nuclear, chemical, and biological weapons, materials, or technologies by providing a four-level increase for those offenses in subsection (a)(1) of both §§ 2M5.1 (Evasion f Export Controls) and 2M5.2 (Exportation of Arms, Munitions, or Military Equipment or Services Without a Required Validated Export License). This increase serves to make the penalty structure for those offenses proportional to other national security guidelines in Chapter Two, Part M. In addition, Appendix A (Statutory Index) is amended to refer one of the offenses, 50 U.S.C. § 1701 (which prior to this amendment was not referenced in the Statutory Index), to both §§ 2M5.1 and 2M5.2.

USSG App. C (Amend. 633).

Amendment 753 to Guideline § 2M5.2, effective November 1, 2007, modified Section 2M5.2(a)(2) to provide that the base offense level was 14 "if the offense involved only (A) non-fully automatic small arms (rifles, handguns, or shotguns), and the number of weapons did not exceed two [which, prior to the amendment, was ten], (B) ammunition for non-fully automatic small arms, and the number of rounds did not exceed 500, or (C) both." The amendment also added a reference to a statutory

provisions (22 U.S.C. § 8512 and 50 U.S.C. § 1705) to the Statutory Provisions section in the Commentary to Guideline § 2M5.2.

The Application Notes to Section 2M5.2, including the reference to the USML, did not otherwise change as a result of Amendment 753. Guideline § 2M5.2 has always had a relatively high base offense level, starting with 22 and increasing to 26, which strongly signals the intent that this offense, which encompasses the export of military equipment without a license, carries a significant jail sentence (a range of 46-57 months at level 22 and a range of 70-87 months at level 26). The Commentary to Guideline § 2M5.2, through its express reference since 1990 to the USML, makes clear that the guideline (and its base offense level of 22 or 26) is intended to encompass the export of USML-based items. The only "carve out" for a lower offense level concerns non-fully automatic small arms; this lower offense level does not apply here and the defendant does not warrant a probationary term simply because § 2M5.2 does not include a more gradated punishment range. The Sentencing Commission intentionally developed a scheme that punishes more severely the illegal export of the "sophisticated weaponry" that involves national security and foreign policy interests—the type of military technology illegally and repeatedly exported by the defendant. Simply put, defendant's illicit conduct is exactly what the U.S. Sentencing Commission contemplated in fashioning § 2M5.2.

11

The defendant attempts to jettison the range generated by Section 2M5.2 by labeling Section 2M5.2 as a "blunt instrument," R. 268 at 3, and claiming that the applicable advisory range "do[es] not provide rational guidance in this case." *Id* at 2. The range, however, for the reasons discussed above, correctly reflects the severity of the offense the defendant committed. The guideline is not, as the defendant claims, "one-size-fits-all" (*id* at 2) but instead specifies factors to be used in differentiating cases:

> In determining the sentence within the applicable guideline range, the court may consider the degree to which the violation threatened a security or foreign policy interest of the United States, the volume of commerce involved, the extent of planning or sophistication, and whether there were multiple occurrences. Where such factors are present in an extreme form, a departure from the guidelines may be warranted.

The defendant does not address these factors which, when considered with the facts here, militate toward an *increased* sentence given the nature, volume, and length of defendant's conduct..

## B. History and Characteristics of the Defendant

The defendant was a well-educated professional, with both undergraduate and graduate degrees, and an experienced participant in the defense contract world, at the time she committed this offense. The defendant worked for Vibgyor or received payment from the company, the family business, between 2005 and 2013 and ran USI, her own defense contract company, for a portion of that time. The defendant assisted Vibgyor when bidding on DOD contracts, communicating with vendors, and

in processing payment requests from Chinese manufacturers. The defendant, through Vibgyor, had direct exposure to export controls and license requirements. Vibgyor obtained its first Department of State registration and applied for export licenses while the defendant worked there. The Vibgyor-filed export license applications contained direct references to USML categories. When DDTC denied Vibgyor's license application because Vibgyor sought to export USML-covered parts to China, Vibgyor switched the export destination to India and submitted the exact same application, but for this change, to DDTC again. Vibgyor maintained in its office a copy of the USML and a file folder marked "ITAR" (International Traffic in Arms Regulations) during the defendant's period of employment.

Bharat Verma's conduct was more egregious than that of the defendant and merits a lengthier term of incarceration even in light of Bharat Verma's age and health issues. The defendant became involved with DoD contracts and the export of defense articles through her family's business and it is unlikely she would have committed this crime were it not for her family's connection to this line of work. The government's recommended sentence of 30 months incarnation accounts for these mitigating factors but, at the same time, properly accounts for the seriousness of the crime and the defendant's personal role in committing it. The defendant had multiple career alternatives and multiple opportunities to leave the family business. Defendant instead maintained her employment with Vibgyor, knowing full well about its illegal exports of USML items, and at one point she chose to start her own DoD-

related company. The defendant, while operating her own company, chose to solicit PRC-based manufacturers to produce items destined for use in fulfilling DoD contracts. The defendant chose to redact government warnings from the technical drawings and then to email them to the PRC. The defendant chose to reroute military equipment through India, in order to hide the true country of origin from the United States government—even after her home was searched and she was interviewed by federal agents. These persistent efforts, through the decisions the defendant herself made, are significant factors and they warrant a term of incarceration.

###    C.    General and Specific Deterrence and Protection of the Public

The government agrees that defendant is unlikely to recidivate and that specific deterrence is not a significant issue. A sentence of incarceration, however, is needed for general deterrence in order to prevent others from committing similar offenses. The probationary sentence sought by defendant will embolden other companies to copy defendant's violations. The mere fact of a felony conviction is not, in itself, a deterrent to this type of conduct. As the Court was able to observe, illegal export cases are difficult to investigate and prosecute, and general deterrence will only be served by the imposition of a significant sentence that will cause would-be perpetrators to take note.

###    D. Need to Avoid Sentencing Disparities Among Defendants

The Sentencing Guidelines, although advisory, serve an important purpose: to ensure that similarly situated defendants do not receive disparate sentences. The

14

sentence a particular defendant receives should not depend on the sentencing district or judge, or the prosecutor or defense attorney handling the matter. Courts are statutorily directed to consider the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(6). A term of imprisonment as recommended by the government will ensure that defendant is sentenced to a term similar to those defendants with similar offense conduct and criminal backgrounds.

The 30-month sentence that the government recommends here is consistent with those imposed in other, similar cases. The defendant spends a significant portion of her sentencing memorandum recounting cases in which sentencing courts imposed below-guidelines sentences.[1] The government agrees that a guidelines sentence is not appropriate given all the facts of this case, but a sentence such as that requested by defendant would be completely untethered from the sentencing guidelines and result in a sentence dissimilar to others with similar offense conduct. The government found several cases that reflect the application of § 2M5.2 to a variety of export cases and prison sentences similar to that advocated by the government here have been imposed.[2]

---

[1] It does not appear that any of the cases that defendant cites involve the export of technical data as occurred multiple times in this case. As noted, exporting technical data, as opposed to a sample part, is particularly troubling because technical data gives to the foreign power the blueprints for the construction of the item without the need to reverse engineer it.

[2] Several of the cited cases are pre-*Booker*, but it is noteworthy that requests for downward departures were frequently denied.

15

In *United States v. Reyes*, 270 F.3d 1158 (7th Cir. 2001), the defendant was convicted under AECA and IEEPA for the illegal exportation of military aircraft component parts destined for Iran and sentenced to 41 months incarceration. Defendant was vice president of sales and marketing for Siraj International, Inc., a broker of commercial and military aircraft component parts located in Wisconsin.

In *United States v. Muthana*, 60 F.3d 1217 (7th Cir. 1995), the defendant was convicted of knowingly and willfully using an export control document which contained a false statement and omitted a material fact to export defense articles (56,000 rounds of ammunition). Defendant claimed on the documentation that the shipment consisted of 3,086 pounds of honey. Defendant was sentenced to 41 months' imprisonment. The district court rejected defendant's argument that he was entitled to a downward departure because his offense conduct posed no risk of harm to a security or foreign policy interest of the United States. The Seventh Circuit affirmed the defendant's sentence, and this discretionary decision, on appeal.

In *United States v. Dobek*, 789 F.3d 698 (7th Cir. 2015), the defendant was convicted of exporting munitions illegally to Venezuela and sentenced to 84 months' incarceration. Defendant was an engineer with a firm that made parts for military airplanes and illegally exported canopy seals (devices for sealing the cockpit's transparent acrylic canopy, which gives the pilot all-round vision, to the canopy's frame), in violation of 22 U.S.C. § 2778(b)(2).

In *United States v. Pulungan*, 569 F.3d 326 (7th Cir. 2009) (rev'd, other grounds), defendant tried to export 100 Leupold Mark 4 CQ/T riflescopes through Saudi Arabia to Indonesia. Defendant was convicted of a 22 U.S.C. § 2778(c) violation and sentenced to 48 months' imprisonment.

In *United States v. Al-Balawi*, 2018 WL 1859122 (N.D. Ind. April 18, 2018), the defendant pled guilty to smuggling goods (rifle barrels) from the United States to Saudi Arabia and was sentenced to 24 months' imprisonment. The district court rejected the defendant's claim that he was entitled to a downward departure because the matter was not harmful to the United States. The district court found that, pursuant to Section 2M5.2, the defendant's conduct had potentially harmful effects and that this was not a case where there was no such risk. 2018 WL 1859122 at *4. ("Defendant had no control over what happened to those rifle barrels once they reached Saudi Arabia. Indeed, the Court finds that the illegal export and sale of the barrels in a foreign country had the potential to be harmful to American security and foreign policy interests.")

In *United States v. Carter*, 550 F.Supp.2d 148 (D. Maine 2008), defendant was convicted of engaging in a conspiracy to export firearms without a license to Canada and sentenced to 31 months' imprisonment. The district court concluded, over the defendant's objection, that the base offense level was 26 under Section 2M5.2.

In *United States v. Tsai*, 954 F.2d 155 (3rd Cir. 1992), the defendant was convicted of AECA violations for exporting components of military equipment (optical

17

receivers (prisms) used in the proximity fuse of the guidance system of the 9-M Sidewinder, an air-to-air missile) to Taiwan. The district court sentenced the defendant to 87 months' imprisonment, which represented an upward departure from the Guidelines range of 51-63 months based on Section 2M5.2's base level of 26. The district court based its upward departure to level 29 on the huge quantities contemplated in the conspiracy and the duration of the offense. The Third Circuit, on appeal, reversed the sentence and remanded for resentencing, finding that the conduct fell "within the heartland [of the Guidelines cases] because the [Sentencing] Commission, in establishing the Guideline range, considered that the offense was potentially harmful to national security or foreign policy interests" and nothing in the record suggested that the defendant's actions "were harmful in a way that the Sentencing Commission did not contemplate." 954 F.2d at 155.

In *United States v. Nissen*, 928 F.2d 690 (5th Cir. 1991), defendant was convicted of AECA violations for conspiring to export a military aircraft part known as a venture heater which was used to heat certain control surfaces of the Phantom F-4 two-man fighter aircraft to afford proper steerage and was sentenced to 44 months' imprisonment, which was within the applicable Guidelines range under Section 2M5.2. The Fifth Circuit, in affirming the sentence, noted that the venture heaters, while only a component part, were "involved in a tangible way" in "sophisticated weaponry" (the Phantom F-4 aircraft) (which was required by Section 2M5.2 for a base offense level of 22 at the time) because of the role the component

part played in the operation of the aircraft. *Accord, United States v. Fu Chin Chung*, 931 F.2d 43 (11th Cir. 1991) (cathode assembly that was part of a Hawk missile guidance system).

In *United States v. Helmy*, 951 F.2d 988 (9th Cir. 1991), defendant convicted of conspiracy to export munitions items (MX-4926—a critical component in the construction of rocket nozzles) and was sentenced to 46 months' imprisonment.

## IV.    Supervised Release

Pursuant to 18 U.S.C. § 3583(b)(2), the Court may impose a term of supervised release of not more than three years.  The guideline range for a term of supervised release is one year to three years. § 5D1.2(a). Based on the § 3553 factors set forth above, it is the government's position that the Court should impose a one-year term of supervised release and that the defendant should be subject to the conditions set forth below:[3]

### *Mandatory Conditions of Supervised Release:*

The defendant shall, during the period of supervised release:

(1)    Not commit another Federal, State, or local crime.

(2)    Not unlawfully possess a controlled substance.

(5)    Cooperate in the collection of a DNA sample if the collection of such a sample is required by law.

---

[3] For ease in reference, the government's recommendations track the order and numbering of the mandatory, discretionary, and special conditions of supervised release set forth in the Form 245B-Judgment in a Criminal Case contained on the district court's website.

(6)    Refrain from any unlawful use of a controlled substance AND submit to one drug test within 15 days of release on supervised release and at least two periodic tests thereafter, up to 104 periodic tests for use of a controlled substance during each year of supervised release.

### *Discretionary Conditions of Supervised Release:*

The defendant shall, during the period of supervised release:

(4)    Seek, and work conscientiously at, lawful employment or pursue conscientiously a course of study or vocational training that will equip you for employment.

(5)    Shall refrain from engaging in a specified occupation, business, or profession bearing a reasonable direct relationship to the conduct constituting the offense, or engage in such a specified occupation, business, or profession only to a stated degree of under circumstances; (if checked yes, please indicate restriction(s): The defendant shall be debarred from entering into contracts with the Department of Defense pursuant to 10 U.S.C. § 2408, unless the Secretary of Defense determine a waiver is in the interest of national security. Defendant shall not knowingly enter into a contract for which the solicitation was made by the Defense Logistics Agency or any branch of the United States military, or for which a component of the Department of Defense is the end-user, unless the Secretary of Defense determines a waiver is in the interest of national security.

Given the nature of defendant's violation and that it involved participation as a sub-contractor for Department of Defense contracts, it is the government's position that a broad restriction on her participation in military contracting, including with prime contractors, is appropriate.

(7)    Refrain from the excessive use of alcohol (defined as having a blood alcohol concentration greater than 0.08%), or any use of a narcotic drug or other controlled substance, as defined in § 102 of the Controlled Substances Act (21 U.S.C. § 802), without a prescription by a licensed medical practitioner.

(8)    The defendant shall not knowingly possess a firearm, destructive device, or other dangerous weapon.

20

The government suggests including the word "knowingly," to clarify the mental state necessary to prove a violation of the condition.

> (14)     The defendant shall not knowingly leave the federal judicial district in which the defendant is being supervised without the permission of the court or probation officer.

The government suggests including the word "knowingly," to clarify the mental state necessary to prove a violation of the condition.

> (15)     Defendant shall report to the probation office in the federal judicial district to which the defendant is released within 72 hours of release from the Bureau of Prisons. During the term of supervised release, the defendant shall report to a probation officer in a manner and frequency directed by the probation officer.

> (16)     The defendant shall permit a probation officer to visit the defendant at any reasonable time at home, or at another reasonable location specified by a probation officer and permit confiscation of any contraband observed in plain view by a probation officer.

> (17)     The defendant shall notify a probation officer within 72 hours after becoming aware of any change or planned change in residence, employer, or workplace, and, absent constitutional or other legal privilege, truthfully answer inquiries by a probation officer.

> (18)     The defendant shall notify a probation officer within 72 hours after being arrested, charged with a crime, or questioned by a law enforcement officer.

## V. <u>Conclusion</u>

For the foregoing reasons, the government requests that the Court sentence defendant to a term of imprisonment of 30 months, along with the special assessment, and term of supervised release, with recommended conditions, set forth above.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:  /s/ *Bolling W. Haxall*
BOLLING W. HAXALL
DIANE MacARTHUR
SHOBA PILLAY
Assistant United States Attorneys
219 S. Dearborn Street, Fifth Floor
Chicago, Illinois 60604
(312) 353-5300

Dated: August 9, 2018