```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3                                )
       UNITED STATES OF AMERICA,  )
 4                                )   Case No. 15 CR 18-3
                    Plaintiff,    )
 5             vs.                )
                                  )
 6     URVASHI VERMA, also known as )  Chicago, Illinois
       "Sonia Verma,"             )   August 16  2018
 7                                )   10:30 AM
                    Defendant.    )
 8
                  TRANSCRIPT OF PROCEEDINGS - Sentencing
 9              BEFORE THE HONORABLE ELAINE E. BUCKLO

10     APPEARANCES:

11     For the Plaintiff:      MR. JOHN R. LAUSCH, JR.
                               UNITED STATES ATTORNEY
12                             BY:  MS. DIANE MACARTHUR
                                    MS. SHOBA PILLAY
13                                  MR. BOLLING W. HAXALL
                               Assistant United States Attorneys
14                             219 South Dearborn, 5th Floor
                               Chicago, Illinois 60604
15
       For Defendant
16     Urvashi Verma:          FREEBORN & PETERS LLP
                               BY:  MR. DYLAN D. SMITH
17                             311 South Wacker Drive, Suite 3000
                               Chicago, Illinois 60606
18
       Also Present:           MR. ZAKARY FREEZE,
19                             United States Probation.

20

21

22     Court Reporter:         SANDRA M. MULLIN, CSR, RMR, FCRR
                               Official Court Reporter
23                             219 S. Dearborn Street, Room 2260
                               Chicago, Illinois  60604
24                             (312) 554-8244
                               sandra_mullin@ilnd.uscourts.gov
25
```

1       (Proceedings heard in open court:)

2               THE CLERK:  Calling 15 CR 18-3, USA versus Urvashi

3       Verma.

4               MS. MACARTHUR:  Good morning, your Honor.  Diane

5       MacArthur and Bolling Haxall, who will be joining us shortly,

6       on behalf of the United States.  And I believe Ms. Pillay

7       will be here as well.

8               THE COURT:  Okay.  Good morning.  I don't really

9       know what to do.  We were supposed to have a plea at 10:15,

10      but, 15 minutes late, I don't really -- I don't know how long

11      I would keep you waiting, so I think I'll just go ahead.

12              MR. SMITH:  Thank you, Judge.  And Dylan Smith for

13      Urvashi Verma, who is present.  Judge, if I could just have a

14      moment to set up at counsel table.  I was just waiting

15      because I thought the change of plea was going to go forward.

16              THE COURT:  Sure.  Well, whether you do it, if they

17      suddenly show up, we will probably go ahead.  But, otherwise,

18      we will just -- might as well do this.

19              PROBATION OFFICER:  Judge, Zack Freeze with

20      probation here.

21              THE COURT:  Good morning.

22              PROBATION OFFICER:  Good morning.

23              MS. MACARTHUR:  Your Honor, if I may, for the

24      record, Shoba Pillay has arrived for the United States as

25      well.

1          THE COURT:  Yes.  Good morning.

2          MS. PILLAY:  Good morning, your Honor.

3          THE COURT:  We will try to do this expeditiously.

4   I guess we'll go ahead with the plea, if they're here now.

5   Counsel here?

6          (Recess from 10:33 a.m. to 10:44 a.m.)

7          MS. MACARTHUR:  Good morning again, your Honor.

8   Diane MacArthur on behalf of the United States.  Your Honor,

9   I'm going to be referring during my comments to a series of

10  exhibits that were admitted at trial, and I have a copy of

11  those exhibits for your Honor, if you'd like.

12         THE COURT:  Okay.

13         MS. MACARTHUR:  Your Honor, if your Honor wanted to

14  begin with some of the preliminaries, we have received a copy

15  of the PSR.  We don't have any corrections to the information

16  that it contains.

17         THE COURT:  I don't think you did either; did you?

18         MR. SMITH:  Judge, I had one really

19  non-substantive, I think it was essentially a scrivener's

20  error.  And then I did, in reviewing it again last night,

21  note one thing also that I think won't be controversial,

22  judge, it's -- I noted this in a footnote to my sentencing

23  memorandum.  In Paragraph 21 of the PSR, there is a reference

24  to, "Beginning in as early as 2000, Vibgyor entered into

25  contracts with prime contractors."  And then it goes on to

1    say, "The defendant purchased one sample of the part from

2    another US-based manufacturer."  The paragraph goes on and

3    refers to co-defendant, Bharat Verma.  And I think it's

4    pretty clear from context that the defendant referred to

5    there is Mr. Verma.  I suspect that the probation officer, as

6    would make sense, probably was -- had some common elements to

7    the PSR for both Mr. Verma and Ms. Verma.  So I would ask

8    that the reference to the defendant be changed to Bharat

9    Verma there.

10              MS. MACARTHUR:  No objection, your Honor.

11              THE COURT:  All right.

12              MR. SMITH:  And then, Judge, this is the one, and I

13   apologize, I didn't notice it, as I mentioned, until I was

14   rereading the pre-sentence report last evening.

15              In Paragraph 39, there is a statement that, "In

16   January 2010, agents executed a search warrant at Bharat

17   Verma's residence and defendant Urvashi Verma's residence."

18   And then it goes on to say, "At this time, Siddharth and

19   defendant Urvashi Verma were interviewed by federal agents."

20              I believe it's correct that, in January 2010, those

21   interviews were conducted.  I believe the searches that are

22   being referred to here occurred in April or May 2010.  The

23   government can correct me if my memory is inaccurate there.

24   I'm not sure it really matters very much, but --

25              MR. HAXALL:  April.

1          MR. SMITH:  Late April, Mr. Haxall is indicating.

2     So I would just ask if the --

3          THE COURT:  January should say April?

4          MR. SMITH:  Correct.  And then, rather than saying,

5     at this time, it would be in January 2010.

6          THE COURT:  Is that agreed?

7          MS. MACARTHUR:  Yes, your Honor.

8          THE COURT:  Okay.

9          MR. SMITH:  Thank you, Judge.

10          THE COURT:  I'll let you go ahead.

11          MS. MACARTHUR:  Your Honor, we recommended in our

12     memorandum to the court that Ms. Verma receive a sentence of

13     30 months.  And we base this recommendation in part on the

14     seriousness of her conduct in this case, as well as the fact

15     that we viewed her conduct as being less culpable than her

16     father.  We'd recommended a sentence of 60 months, or

17     5 years, for Mr. Verma.

18          Yesterday the court sentenced Mr. Verma to eight

19     months, and so we are going to modify our sentencing

20     recommendation.  We think that 30 months in the context was

21     appropriate.  But given Mr. Verma's sentence, which took into

22     account Mr. Verma's health and his age, we think that a

23     sentence of incarceration of eight months is appropriate for

24     Ms. Verma as well.  And the reason for that is in part

25     because Mr. Verma, again, has age and health considerations

1   that Ms. Verma does not.  Mr. Verma pled guilty.  Ms. Verma

2   did not.  And we still view Ms. Verma's conduct as being

3   serious and causing harm.  And for that reason, we think a

4   jail sentence is appropriate and eight months accounts for

5   those various factors.

6        I'm going to address, Judge, with the court's

7   permission, the 3553 factors in relation to Ms. Verma.

8        THE COURT:  Yes.

9        MS. MACARTHUR:  The charged conspiracy spanned from

10  2006 to 2014.  Ms. Verma's principal activity during that

11  period took place during a four-year block of time, roughly

12  between 2006 and 2010.  The case does involve a family

13  business.  And Ms. Verma's father, Bharat Verma, was the

14  leader of that family business.  And so from that, it's easy

15  to think of Ms. Verma as working in the family business and

16  essentially under the guidance and control of her father.

17  But that, given the facts as we now know them, would not be

18  accurate.

19       Ms. Verma, when you think of her age, was actually

20  between 32 and 36 years of age during this four-year block of

21  time.  She had, by that time, a bachelor of arts degree, as

22  well as a master's degree, and she received both of those by

23  2001, four or five years before the conspiracy period in

24  which she actively participated began.  And she also had

25  worked for a year at Northwestern University as a research

1    program director.  She was married for a period of time
2    during this four-year period, and she was living in a
3    condominium with her husband, apart from the rest of the
4    family.
5            She was her own person.  She was successful.  She
6    was well-educated and independent when she participated in
7    this four-year block of time.  She participated, in our view,
8    in this conspiracy on her own terms, and she helped to expand
9    the conspiracy in her own way, particularly when she was
10   operating her business, US International.
11           She had several active roles while she worked
12   directly for Vibgyor.  We know that by 2005 -- and this is
13   the second page of the exhibits that I handed to your Honor,
14   it was marked as Government Exhibit TP-3 at trial -- that the
15   then-used Chinese manufacturer, UOM, was communicating with
16   Sonia, Ms. Verma, for purposes of justifying various balances
17   of payments made to or from the two firms, UOM and Vibgyor.
18   She was their go-to person.
19           This shows us, from sort of an overview, or a
20   factual perspective, that Ms. Verma at that point was herself
21   directly involved in communicating with Chinese manufacturers
22   on Vibgyor's behalf.  She continued to have that same sort of
23   a direct role in Vibgyor's business.
24           The financial success of Vibgyor during this period
25   of time, again, goes hand-in-glove with the fact that Vibgyor

1   was using Chinese manufacturers to have their parts made.

2   Vibgyor's volume of business, their sales income during this

3   period of time, varied between being quite large, million

4   dollars in 2006, 1.3 million in 2007, to dropping to around

5   500 to $700,000 in the later years.

6           Ms. Verma's salary, through Vibgyor during this

7   period of time, we also believe was reflective of her value

8   and her active participation in the firm.  Her salary ranged

9   from a high of about $95,000 to a low of about $14,000 in the

10  years of 2013 and 2014.

11          I'm going to shift now to the USI years, and that

12  began in 2008, because we think that that period of time, if

13  viewed from that perspective alone, shows why a jail sentence

14  is justified in this case because, during that period of

15  time, while still connected with Vibgyor, Ms. Verma was

16  largely acting on her own taking her own steps to further

17  this conspiracy.  She expanded the scope of the conspiracy by

18  means of reaching out and finding on her own her own Chinese

19  manufacturer for the parts that were then used to fill these

20  Department of Defense contracts.

21          She sent out an e-mail -- and this is another one

22  of the exhibits that I've included, it's Government Exhibit

23  EML1-21, that was admitted at trial, which is, in effect, a

24  blast e-mail to 11 or more Chinese-based firms, basically

25  seeking from one of them, or more than one of them, bids on

1   two particular items that are listed in the e-mail.  And she

2   even attached the technical data or the drawings for those

3   bids to the actual e-mail.  And this is to a group that she

4   had no business relationship with.  This was her entree on

5   her own into the world of Chinese manufacturers.

6           One of them, Xiamen, became her go-to manufacturer

7   in China for the parts that she then developed and had made

8   through USI.  It was an affirmative act on her part, under

9   the guise of USI working with Vibgyor, to continue to use

10  China to have these parts made on behalf of the firms.

11          Ms. Verma also kept her eye out for business for

12  both her own firm and Vibgyor during this period of time when

13  she was operating USI.  On April 30, 2009, and this is

14  Government Exhibit EML1-93, Ms. Verma sent her parents and

15  Vibgyor an e-mail in which she asked them if they had already

16  quoted for a particular job.  And she said, at the end of

17  that e-mail, quote, "Wanted to make sure we don't miss it."

18  Double exclamation point.  And this is another example, your

19  Honor, of an affirmative act that Ms. Verma took through USI

20  as a part of this conspiracy to expand and include more

21  business as a part of the work of the firms.

22          Ms. Verma was also leading essentially a double

23  life, particularly when she was working with USI.  And this

24  is especially aggravating because the double life that I'm

25  talking about is that, on the one hand, she portrayed herself

1    to the regulatory world as in compliance with the regulations

2    and the rules and the law.  But, on the other hand, at the

3    same time, she was blatantly violating those rules, those

4    laws, by sending technical data and sample parts to China to

5    be manufactured for the Department of Defense contracts.

6              In 2009, she applied for and received access, in

7    USI's name, to cFolders, that subgroup of information that

8    you have to receive that certification for before you're

9    allowed to be exposed to.  The cFolders contained the

10   sensitive technical data that is included on the US Munitions

11   List, to which the rules and regulations and the law applied.

12   Ms. Verma acknowledged in receiving that certification by

13   signing the form her responsibilities under the applicable

14   laws, the export laws.  And she agreed, through signing that

15   form, to abide by them and to obtain an export license for

16   the release of militarily critical technical data.  And this

17   is Government Exhibit JCP-3 that's in the materials.

18             And at the same time, Judge, as another step to

19   show the outside world that she was apparently compliant,

20   your Honor heard the testimony at trial from the acquaintance

21   in the condominium building who was effectively employed by

22   Ms. Verma to create letterhead forms for USI's use when

23   placing bids or receiving bids from different contractors or

24   suppliers.  And Ms. Verma, through this testimony, asked this

25   acquaintance to add export control language to one of those

1    forms.  And it was the quotation form that specifically,

2    expressly, said that some of the items, the parts, might be

3    export-controlled.

4            But the other side of this is also compelling, your

5    Honor, when it comes to a sentencing determination because,

6    while she was giving these outward appearance of compliance,

7    she, at the same time, was repeatedly sending

8    export-controlled technical data to China to have these parts

9    manufactured there.  Some of these data, some of this data,

10   was on the USML.  Some of this data was sensitive.  Some of

11   it applied to sensitive, critical military equipment.

12           She did this not once, she didn't do it even twice.

13   She did it many times over the course of a long period of

14   time.  And we presented at trial the means by which Ms. Verma

15   tried to make it appear otherwise.  And this was the body of

16   evidence that perhaps is the most egregious of all that has

17   to do with Ms. Verma's affirmative redaction of the export

18   control language from this technical data, including the

19   restrictive distribution statements before sending it to

20   China for manufacturing there.

21           So this is one of those factors that also plays

22   into the government's view that jail is appropriate here and

23   why probation is not appropriate.  She sent this technical

24   data, which Mr. Blanks identified as giving, in effect, the

25   recipient a step up, in that they're receiving the

1    blueprints, the way to manufacture the equipment, much more

2    so than a component part to China.  And she affirmatively

3    tried to remove from the face of this information the

4    evidence that was export-controlled.

5           The stack of bid packages, that stack from the

6    Nordstrom bag that Mr. Haxall displayed during his rebuttal

7    argument at trial, the volume, the detail involved, shows the

8    care and the time and effort that Ms. Verma put into trying

9    to get these parts as a part of the Vibgyor USI business, and

10   the care that she took to send them to China in order to get

11   the lowest price.

12          Now, Ms. Verma, through her submissions, argues

13   that she should receive a reduced sentence because she did

14   not intend to assist an adversary or foreign power or to harm

15   the United States.  But one of the objects of the conspiracy

16   of which Ms. Verma was convicted was a conspiracy to defraud

17   the United States.  And those actions, in saying the one

18   thing on the one hand on the regulatory forms and on the

19   other to blatantly send technical data repeatedly to China,

20   shows that she made multiple efforts to defraud the United

21   States during the conspiracy.  She did it knowingly, she did

22   it willfully, and she did it repeatedly over time.

23          She may not have intended to help the hostile power

24   or an adversary of the United States.  But as we talked about

25   yesterday, once that information was released, Ms. Verma had

1      no control over what happened to it next.  Who would see it,

2      who would use it, and who would glean valuable information

3      from even something seemingly as little as the specifications

4      as to what alloy is used to make a metal part or what coating

5      is placed on a lens put into a tank.

6                And the message that Ms. Verma sends, or sent,

7      through her conduct in this way is that there is a hole,

8      multiple hole, that she herself poked into this wall of

9      protection of export control that we have tried to enforce

10     within the United States.  By all appearances, she didn't

11     care, she willfully violated it, and she didn't seem to give

12     it any regard.  What message does that send through her

13     conduct to the rest of the world?

14               Mr. Smith also discussed what he claimed was the

15     lack of sophistication of the parts that Ms. Verma

16     transmitted to China.  That they were simple things, like

17     washers and spacers.  They may be simple, they may be

18     fundamental, but they are no less vital to the equipment.

19     And Mr. Blanks explained some of that in his testimony

20     yesterday, as did the other witnesses from DTSA during the

21     course of the trial.

22               I think of the adage, your Honor, of, you can't

23     judge a book by its cover.  In this case, I think the adage

24     also applies, which is to say, you can't judge the importance

25     of a component part by the way it appears because it plays a

1    vital role to the operation of critical military equipment.

2          There was discussion yesterday about whether any of

3    the parts in this case were actually found to be defective

4    that had been made in China.  And the answer Mr. Haxall said

5    yesterday was, yes.  And he referred to what is known as a

6    PQDR, Product Quality Deficiency Report.  And there is

7    another example in that same line I wanted to remind your

8    Honor of that was presented at trial.

9          A witness named Harlan Dozier, a quality inspector

10   on behalf of the government, testified at trial that, in

11   2008, an eyepiece assembly, a series of eyepiece assemblies,

12   were found defective by the Department of Defense after the

13   Department of Defense received them from a contractor named

14   Covert.  Mr. Dozier was asked to communicate with Vibgyor to

15   find out what happened because it was Vibgyor who presented

16   those parts to Covert.  Long story short, Mr. Dozier asked

17   Vibgyor, Mr. Verma, not Ms. Verma, to present certificates of

18   compliance to show, essentially, who made these parts and how

19   they were inspected.

20         During the course of that exchange, Mr. Verma, it

21   appears, through Vibgyor, presented to Mr. Dozier an e-mail

22   from Covert explaining, essentially, what happened, how this

23   mistake had occurred.  And the information presented, in a

24   nutshell, was that there had been a transposition of certain

25   numbers, of certain dimensions, that had caused the error.

1    In other words, the e-mail said -- and this is government

2    Exhibit Dozier 5 or 6 in the materials.  Said that the

3    dimensions in the drawing, that would have been the US-based

4    drawing, had been converted from inches to milliliters; and

5    that when those milliliter numbers were entered into the

6    machine that made the part, there was a miscoding of the

7    number, which led to the part being too thick for use.

8            Well, your Honor, Mr. Dozier never saw the machine

9    at Vibgyor that was used to make those parts.  And we know

10   from the evidence that at that time Vibgyor was having its

11   eyepiece assemblies made, the component parts at least, in

12   China.  And so this series of component parts made in China

13   led to a defect in the material that Vibgyor presented to the

14   contractor who, in turn, presented it to the Department of

15   Defense.  And this plays right into, or is an excellent

16   example of, the situation Mr. Blanks described yesterday,

17   where there is risk, there is the potential of harm when

18   someone like USI, or Vibgyor, or Mr. Or Ms. Verma, take a

19   technical drawing, try to translate it or redraw it, transmit

20   it to China, and the parts are then made there.  This is the

21   exact type of problem that leads to defects that, in this

22   case, or in this example, just happened to be caught.

23           I want to talk for just a moment about Ms. Verma's

24   exit from USI and the defense contract world.  Ms. Verma was

25   interviewed by federal agents in January of 2010.  Her house,

1    as we just mentioned, was searched in April of 2010.  And the

2    operations of USI stopped around this time, and Ms. Verma had

3    much less involvement with Vibgyor.  And these are good

4    things.  These are mitigating factors in terms of Ms. Verma's

5    sentencing consideration.  But while they're good things, her

6    exit from both firms, USI and Vibgyor, was slow.  It did not

7    stop immediately, it did not stop entirely because, during

8    this slowdown period, she continued to violate the export

9    laws and tried to conceal her actions.

10          On April 23, 2010, about four months after her

11   January interview, Ms. Verma sent an e-mail to her Chinese

12   manufacturer, telling the manufacturer, in block capital

13   letters, please do not send any items via DHL to US at this

14   time.  This is Government Exhibit EML1-106.  She asked the

15   manufacturer to send the product to India instead.

16          The incident that triggered in part the interview

17   in January was Ms. Verma's effort to send a sample part, the,

18   for us, infamous plate indicator, to China via UPS, which was

19   seized by the agents and led ultimately to the interview.

20   What this e-mail shows is Ms. Verma's desire not to get

21   caught again.  She was trying to stop a shipment from China

22   being sent to her through express mail, and, instead, she was

23   trying to redirect that package to India.

24          The manufacturer did as she was asked to do, and

25   she sent the package to India to a place called UMC Machinery

1   Stores. And we also heard about that company at trial. It's
2   that company that was located in Delhi, India. And we had a
3   representative come in and talk about the type of building
4   that it was in. It's essentially an office with nothing
5   more. And that was Government Exhibit EML1-107.

6           She was still involved when Vibgyor applied for an
7   export license in the fall, in September of 2010, which is to
8   say, this is the incident that we described at trial where
9   initially Vibgyor asked for an export license to send product
10  to China. That was denied. And they immediately submitted
11  another application, which this time said India, again,
12  referring to UMC Machinery as the end user, or the end
13  destination.

14          But Ms. Verma is involved, or at least indirectly
15  in this situation as well because, as the evidence showed,
16  and I think it was -- the license was DDTC-7 at trial, there
17  was a folder that was seized from Vibgyor. It's VIB3-3,
18  which is labeled on the top, Sonu's Way. Sonu is the
19  family's name for Sonia's first name. Inside that folder was
20  an exact copy of the application submitted by Vibgyor where
21  India was listed as the end destination. And that's in
22  keeping with what I've just described as Sonia's e-mail
23  communication with the Chinese manufacturer to use India as a
24  means of circumventing the regulatory eyes to conceal the
25  ongoing conduct by Vibgyor.

1      Again, Judge, this is significant, in the

2  government's view, when assessing what sentence to impose on

3  Ms. Verma because, through her actions with USI as a part of

4  this conspiracy, she is showing her independence and her own

5  affirmative steps in violating the export laws.

6      I don't know if this is significant or not, but on

7  Page 22 of the PSR, there is a listing of Ms. Verma's

8  employment.  There is a real estate firm, there is other

9  information involved.  There is a block that says Vibgyor

10  from 2005 to 2010.  There is nothing listed by way of USI.

11  It's as if in that employment history USI did not exist.  I

12  don't know whether that's an omission on Ms. Verma's part.

13  But if it is, Judge, I will just say, candidly, USI cannot be

14  erased that way, and it cannot be folded into Vibgyor or put

15  under the Vibgyor umbrella in that way.  Because the things

16  that Ms. Verma did on her own through USI as a part of this

17  conspiracy stand on its own.

18      I'm going to talk much less at length about

19  Ms. Verma's history and characteristics because I suspect

20  that Mr. Smith will spend some time on that.  Ms. Verma has

21  moved on in her life.  That is to her credit.  And that, too,

22  is certainly something that should be considered as a part of

23  her sentence.  She has created another career for herself.

24  There is every indication that there is hope for her future.

25  But I also need to emphasize, too, that that doesn't mean

1    that it erases what she has done in her past.  The

2    consequences of her criminal conduct still exist.  The

3    sensitive information is still out there.  And certainly what

4    she did during her participation in the conspiracy is serious

5    conduct and clearly in violation of the law.

6            This is not a situation, Judge -- and I have tried

7    in a couple of ways to think of this to try to carry this

8    thread in my own thought, to challenge it, but ultimately

9    I've concluded that this is not a situation where she worked

10   under her father's thumb.  This is a situation where she took

11   steps on her own.

12           There is no need for specific deterrence in this

13   case.  We truly believe that she will not do this again.

14   There is, though, a need for general deterrence.  There are

15   the national security concerns that we have addressed at

16   length with your Honor.  There is also a concern for general

17   deterrence purposes, though, for all of the efforts made

18   during this conspiracy to defraud the United States.  All of

19   those actions taken to evade the eye of law enforcement, the

20   failures to correct and the continuation of the conduct.

21           Mr. Smith spent some time in his sentencing

22   submission talking about cases as a means of making the point

23   that a sentence within the guideline range here would be

24   abhorrent or would be outside that imposed in other cases.  I

25   recognize we're in a different landscape right now in that

1    we're talking about, at least by the government's

2    recommendation, either probation or up to eight months in

3    jail, but just a couple of notes about those cases, Judge.

4    Your Honor raised a question about it yesterday about

5    Mr. Verma, but a couple of what I think are important points.

6        In the block of cases that Mr. Smith cited under

7    examples of non-custodial sentences, four of the five cases

8    in that block involve defendants who pled guilty.  Clearly

9    Ms. Verma went to trial.  She has not acknowledged the

10   wrongfulness of her actions, or even that she took any

11   wrongful actions at all.  None of them, from what I can tell,

12   involve the sending of technical data overseas.  And, again,

13   we view that, although the same, also of a more aggravating

14   nature than a single component part.

15       In the section for below-guidelines sentences,

16   again, it anticipate appears that six of the seven cases

17   cited involve defendants who pled guilty.  Some of them

18   involve attempts or efforts to export.  Some of them involved

19   actual shipments.  But very few of these cases, in either

20   block, appear to involve, again, either technical data or

21   certainly the number of times that Ms. Verma sent the

22   technical data overseas to China.

23       In the aiding of foreign adversaries section,

24   again, it's sort of a mixed bag, but at least one of those

25   cases involved a guilty plea.

1     There are some similarities in the cases that I
2  think are cited.  There is one, for example, involving
3  multiple shipments, at least some of which went to Russia.
4  And the person in that case got 18 months in jail after a
5  plea of guilty.  There are some that involve technical data.
6  One person, and I recognize there are other egregious reasons
7  involved in these cases, which is why comparisons are hard;
8  but in one case where technical data was involved, the person
9  got 50 months in jail.  The case that's probably the most
10 similar is the *Calik* case that is cited in the very end of
11 this block.  That involved technical data.  It appeared to be
12 sort of a family situation.  It has a lot of similarities to
13 this case.  That person received what turned out to be
14 essentially a 15-month sentence.  It was a sentence of time
15 served.  And, again, Judge, I note that that involved a
16 guilty plea as well.

17     My point here is that, now that, at least by way of
18 the government's recommendation, we're looking at a modified
19 landscape of other sentences imposed, an eight-month sentence
20 in this case really is right there in keeping with some of
21 these other sentences when the similar factors are compared;
22 that being technical data, the absence of a guilty plea here,
23 as well as multiple sending of the information overseas.

24     Judge, I have some comments about supervised
25 release terms that I'll hold until later, but our bottom line

1    is this:  We really believe that an eight-month sentence is

2    appropriate here.  I recognize that, whether it's two months

3    or four months, six months or eight months, the sound of

4    those words is not so much maybe the length within the eight

5    months, but the fact that we're recommending a jail term, and

6    we are.  We stand behind that because we think that it's

7    appropriate in this case.  And we stand behind it because of

8    the numerous ways in which Ms. Verma, over time, defrauded

9    the United States and conducted herself in a way that was in

10   violation of the law.

11            And, Judge, I'm happy to answer any questions the

12   court may have, but that is the end of my comments.

13            THE COURT:  Okay.  Thank you.

14            MR. SMITH:  Thank you, your Honor.  And before I

15   begin, I just want to mention that Ms. Verma will want to

16   address the court after I speak, just so I don't forget that.

17            Judge, I know from your comments yesterday that you

18   had already read the sentencing submissions, and you

19   obviously have the benefit of the arguments that were made

20   yesterday, so I'm going to try not to tread too much over

21   that old ground.  Although, I may hit some of the highlights

22   from my sentencing memo, and also try to address some of what

23   we heard yesterday, as I think it bears on Ms. Verma's

24   sentence.

25            I'm also not going to talk at length about what

23

1    appears to not be in dispute.  The government has
2    acknowledged that specific deterrence is not an issue here.
3    No one seems to be arguing that Ms. Verma is a risk to
4    recidivate.  And the government has acknowledged, both just
5    now from Ms. MacArthur, and in its sentencing memorandum,
6    that Mr. Verma really is the more culpable person here.  And
7    this is on Page 13 of the government's sentencing memorandum,
8    where the government said that Mr. Verma's conduct was more
9    egregious than that of Ms. Verma and merits a lengthier term
10   of incarceration, even in light of Mr. Verma's age and health
11   issues.

12          The government went on:  Ms. Verma became involved
13   with DOD contracts and the export of defense articles through
14   her family's business, and it is unlikely she would have
15   committed the crime, were it not for her family's connection
16   to this line of work.

17          And I think that's very similar to points that were
18   made in the sentencing memorandum I submitted on behalf of
19   Ms. Verma and also in probation's analysis.

20          Judge, I touched in my sentencing memorandum on
21   those family dynamics.  And I do want to talk about that a
22   little bit here today because I thought the proceedings
23   yesterday were enlightening, even given what we knew about
24   the relative roles in this conspiracy and the nature of
25   Vibgyor as a family business.  And I'm referring here both,

1    Judge, to Mr. Verma's statement to the court, which I think
2    gave some insight into the way he sees himself and the
3    overall family narrative and how he fits into that, and also,
4    as I think Mr. Haxall was acute to focus on, albeit for
5    different reasons, the letter from Ms. Verma's mother in
6    support of Mr. Verma.  And what emerged from those
7    statements, Judge, is -- was, you know, something that I
8    think exists in one form or another in all families.  It can
9    take a healthy form or an unhealthy form, but, you know,
10   families, in some way, create their own narratives and their
11   own sense of reality, and it can be a bit of a bubble.  And I
12   think what you heard from Mr. Verma was a version of reality
13   and a narrative that kind of tapped into the idea of the
14   American Dream and working hard and being an immigrant and
15   having an impoverished childhood.  But it was obviously a
16   warped version of that American Dream story.  And I don't
17   intend -- I don't mean to disrespect Mr. Verma's experience
18   in his early life and his deprivations, but I think, as the
19   court pointed out, pursuing the American Dream but violating
20   the law isn't quite getting the idea right.
21           And I'm going to talk about the offense.  And I
22   want to be clear here, I'm not in any way here to challenge
23   the idea that Ms. Verma was in her 30s when the offenses
24   occurred here, but I do think it's relevant in thinking about
25   the context here that this was a business, Vibgyor, that

1    Ms. Verma's father started when she was about 13.  And I
2    realize that at the heart of the business, at least for the
3    years of which we have evidence, there was something wrong at
4    the core in terms of sourcing these parts from China.

5              But if you'll recall the video you saw at the trial
6    at some length and Mr. Verma's work history, there were the
7    trappings of a business here.  This is not like the *Calik*
8    case that Ms. MacArthur referred to, which is, I'll talk
9    about later, the case of someone -- it's the only other
10   export control case that I could find where someone was just
11   basically, you know, a front business for Turkish
12   manufacturers and selling to DOD contracts.

13             So all of which is to say there is no question
14   Ms. Verma ended up in her 30s as an educated person.  But I
15   think anyone who has heard and seen the evidence and heard
16   the sentencing statements understands that there were some
17   longstanding patterns at work, patterns of deference to
18   Ms. Verma's -- a almost mythologizing of Ms. Verma's father
19   and the deference she paid to him as the eldest there.  And I
20   think, for anyone, it's very difficult to accept the idea
21   that your parents are engaged in wrongdoing.  And that's not
22   to in any way, and I want to be careful about this, *minimize*
23   the evidence that the government put forward and that the
24   jury accepted about Ms. Verma's knowledge during the period
25   of the charged conspiracy.  But I do agree with the statement

1   of the government's sentencing submission that Ms. Verma was

2   not someone who was gravitating toward criminal conduct or

3   that we would at all be here, were it not for that family

4   business.  And I also think in terms of --

5          THE COURT:  Of course, you know, I mean, you can

6   only say that so far.

7          MR. SMITH:  Yeah, I -- I don't want to press it too

8   far.  I don't want to --

9          THE COURT:  A mafia family as an --

10         MR. SMITH:  Exactly, Judge.  I really -- I

11  really --

12         THE COURT:  -- example, people grow up in it, that

13  doesn't excuse --

14         MR. SMITH:  It absolutely does not.  It absolutely

15  does not.  And I'm really, just -- this is a little bit of a

16  color here, so I don't want to go on at too much length about

17  that, and I think you've been able to see it.

18         There has been some discussion about the cases

19  cited in my memorandum.  I do think a point that is very key

20  and really didn't get discussed much yesterday, Ms. MacArthur

21  touched on it, this is not a case -- in almost all the cases,

22  including those probationary cases that you can look at in

23  these unlawful export circumstances, someone is trying to

24  transfer someone to a foreign end user in the parlance of

25  these export cases.  Now, I understand, there is no question

1   that under the arms export control laws, if you're

2   transferring the blueprints to get them manufactured and

3   delivered to someone here in the United States, that's an

4   export.  If you're sending a sample over so someone can

5   reverse-engineer it, that's an export.  But the business

6   here, and the intent here, with all the problems we've talked

7   about, was to manufacture -- to have these parts made for

8   sale to the DOD or to subcontractors, that had its own

9   problems.  And we've talked about the integrity of the supply

10  chain, and all of that.

11          But in terms of looking at the motivations and the

12  mens rea, I went to some effort in the cases I cited in my

13  brief to talk about the arguments that were made in

14  aggravation and mitigation at sentencing because it's always

15  very easy after you know what the sentencing -- what sentence

16  was, if it was a relatively lenient sentence to say, oh, but

17  there were these mitigating factors here.

18          Well, so, for example, in the *Mohammadi* case I

19  cite, which was in front of Judge Lefkow, that was the man

20  who was selling a gyroscope to someone he believed was

21  acquiring it for Iran.  So we've got -- and, yes, it was a

22  one time, as opposed to a prolonged conduct here.  But I

23  would submit that intentionally providing a gyroscope that

24  you understand is going to the government of Iran is more

25  serious conduct here.  And what the government pointed out in

1  its sentencing memo, and was unchallenged, was the intent

2  here was that this was going to be the tip of the iceberg.

3        I'll talk -- I'm not going to go through all these

4  cases, Judge, because I did discuss them at length in the

5  sentencing memorandum.  But just to take, as another example,

6  the *Lachman* case, which was one that went to trial where they

7  were, nevertheless, probationary sentences.  The parted issue

8  there was something that was part of a larger development

9  plan for the Indian ballistic missile program.  And the

10 government made very forceful arguments in the sentencing

11 memorandum about why a more lengthy sentence should be

12 imposed, including that you were dealing with sophisticated

13 business people, including the geopolitical situation.  And

14 I'll just mention this because I'm not sure it comes out as

15 explicitly because we're in a different era now.  The conduct

16 at issue then was in the late '80s and '90s.  This is the

17 period when India and Pakistan are in competition, a race to

18 develop nuclear weapons.  So there is a context to that case.

19        And, in any event, Judge, what the cases I cited in

20 my brief were intended to show is, one, that generally in

21 these arms export cases what you're talking about is an

22 intent to transfer to someone overseas.  Yes, technology that

23 is much more sensitive, often dramatically so than what we

24 have in this case.  And I think that is a fundamentally

25 different situation than what we've got here.  But the other

1    point of citing those is that courts have been willing -- and

2    in any case you're going to have a mix of aggravating and

3    mitigating circumstances, and you're not going to find a case

4    that's on all fours, generally speaking, with what's in front

5    of the court.  But the courts have been willing when the mix

6    of aggravating and mitigating factors warrant it to impose

7    probationary sentences in these cases.  And that's what

8    probation has recommended, and that's what we're asking for

9    here.

10            Judge, I don't want to spend a lot of time on what

11   I think we spent a fair amount of time on through Mr. Blanks

12   yesterday with regard to the nature of the harm or potential

13   harm in this case.  I think -- I understand the government's

14   arguments about the integrity of the supply chain and the

15   court's comments about the nature of the potential harm here.

16   But I do want to touch on a little bit the nature of these

17   parts and what it meant to be on the US Munitions List.  It

18   wasn't something, as your Honor pointed out, we needed to do

19   through Mr. Blanks.  But I do want to address it because one

20   thing the government says in its sentencing memorandum is

21   that, by virtue of being on the US Munitions List, these

22   parts necessarily passed, I think they used the phrase, a

23   high bar.  And I just want to recall for the court -- and

24   this was not something we spent a lot of time on trial

25   because, frankly, I don't think it was all that relevant to

1    the factual question of guilt or not.  But I do think, on the

2    overall ledger here, just getting a proper read on where

3    these parts fits in, has some relevance.

4           The court will recall that just about all of these

5    parts, maybe with the eyepiece assembly excepted because that

6    got put together into a larger subcomponent, were on the US

7    Munitions List not because they were listed but because they

8    were in these catch-all categories; where if something

9    always -- and I always forget whether it's specially designed

10   or specifically designed, I think at the time it was

11   specially, designed for some larger weapon system that is on

12   the list, then it gets swept up in the catch-all category.

13          And what, again, we touched on during the cross of

14   the experts, and I'm not going to spend a lot of time on

15   this, there has been this process called export control

16   reform.  And the majority of the parts had come off the US

17   Munitions List doesn't -- I'm not saying this in the sense of

18   absolving the defendants of their conduct here, but I'm just

19   trying to provide some context for the parts here.  And,

20   just -- this is how the State Department has described export

21   control reform, and I just -- it's out of the Federal

22   Register.  As it happens, some of the parts that had not yet

23   fallen off the US Munitions List, maybe all, but the reason

24   it hadn't yet as of the time of trial for that category, they

25   hadn't completed export control reform.  So what the State

1    Department said, as it turns out, they've, for one of the

2    categories, they're now going forward with it.  And I -- and

3    what the State Department said about in proposing the new

4    regulations for these new categories, which includes

5    Category 2, which was one of the categories Mr. Blanks' parts

6    fell into is:

7         The Department of State is engaged in an effort to

8    revise the US Munitions List so that its scope is limited to

9    those defense articles that provide the United States with a

10   critical military or intelligence advantage, or, in the case

11   of weapons, are inherently for military use.  The articles

12   now controlled by USML Categories 1, 2 and 3 that would be

13   removed from the USML under this proposed rule do not meet

14   this standard, including many items which are wildly

15   available in retail outlets in the United States and abroad.

16   Most significantly -- this is now in the catch-all

17   category -- in Category 2, Paragraph J, controlling parts and

18   components will be revised to enumerate the article

19   specifically controlled therein.

20        And, you know, Mr. Blanks talked about the washer

21   on the Howitzer.  In the memorandum prepared by the engineer

22   who did the commodity jurisdiction for the Howitzer, this was

23   a document produced by the government, I can introduce it for

24   the court, if it seems significant.  But what the reviewer

25   said on that particular part was:

1    While these are specifically designed parts, they

2    are trivial and would be released, except for the fact that

3    they pertain to an item in USML Category 2, which has not yet

4    been revised in the ECR process.

5    So, Judge, I don't want to linger there because I

6    don't want, through my presentation here, to suggest that I'm

7    trying to minimize the conduct of which Ms. Verma was found

8    guilty, but there has been some back-and-forth about where

9    these parts fit in.  I think your Honor has made comments

10   yesterday that probably indicate where the court is placing

11   them in the spectrum, and I just wanted the record to be

12   clear about that.  But I think there is no real dispute here

13   that the parts are not, like, accelerometers that are used in

14   missiles, and the like, that you see in many of those cases.

15   Let me talk a little more, Judge, directly about

16   Ms. Verma and the evidence concerning her role in the -- in

17   the conspiracy of which she was convicted.

18   The focus of the government's case really was that

19   2008 through mid-2010 period.  And there is no question

20   that -- I'm not here to re-litigate the evidence about the

21   case in that period or the support for the jury's verdict.

22   It was clearly a point at which whatever the family dynamics

23   were, and so forth, that the evidence was ample to show

24   knowledge of unlawful activity.

25   I do think trying to push it back to the 2005, 2006

1    period as knowing and active participation in the conspiracy

2    is not really supported by the bulk of the evidence before

3    the court.  I mean, Ms. MacArthur just put in a document

4    showing that Ms. Verma was corresponding with this Mr. Yu

5    back in 2005.  You know, I don't know that it's constructive

6    to pinpoint the time at which it was clear that -- should

7    have been clear to Ms. Verma, or was clear to Ms. Verma, that

8    things were not okay.  But I think when you do take the

9    family dynamics, the fact that this was her father's

10   business, she was working at her father's business, the fact

11   that she is conversing with Mr. Yu about the financial

12   accounts doesn't, I think, make this a four-year timeframe

13   for knowing and active involvement in the conspiracy.

14            And one thing I would point out in the PSR, because

15   this came up as to Mr. Verma, he was interviewed in 2005, by

16   agents.  Ms. Verma was not there during that interview.  She

17   was there when the agents came back and returned Mr. Verma's

18   computer and equipment.  So, you know, maybe that's -- that's

19   double-edged, right, to you and me.  Well, anything where

20   you've got agents coming by, that's troublesome.  But, on the

21   other hand, the agents had come, they were returning things,

22   and the business went on for some time.

23            I will say, you know, and this is me speaking as

24   well -- well, I'll just leave it at that.  But, obviously, as

25   to that 2008-2010 period, I'm not here to re-litigate that,

1    Judge.

2            I do think, in terms of the level of sophistication

3    and the level of mens rea from a 3553(a) standpoint, Judge, I

4    do have a slightly different take from the government on what

5    some of that evidence shows in terms of the level of

6    sophistication and what Ms. MacArthur described as this dual

7    life.  You know, when there are e-mails from Ms. Verma

8    saying, hi Mom and Papa, have you thought about this, or she

9    is going up to her neighbor upstairs and saying, you know,

10   can you prepare these forms for my business, there is -- it

11   doesn't take away in any way from, you know, the knowledge

12   that -- the evidence of knowledge about the covering over of

13   things, or the agents coming in and interviewing her.  But

14   there is this tragic combination of I think also still a

15   desire to defer and please her parents, and also some -- I

16   mean, the idea that she is going to an upstairs neighbor and

17   getting her involved in this case to me doesn't show a highly

18   sophisticated approach to this.  I mean, I don't think

19   Ms. Verma was a sophisticated defense contractor,

20   notwithstanding her participation in the family business

21   here.

22            And Ms. MacArthur acknowledged there was this

23   period in 2010, where things slowed down before they stopped.

24   And obviously it would be better if they had stopped more

25   abruptly.  Frankly, I think that's a large part of the reason

1       why we're here and why Ms. Verma was charged.  This is, at

2       the margins, Judge, I think if you look at those exhibits

3       Ms. MacArthur handed up with the file with the Sonu's way,

4       there is a model there from March 2010, and then I think

5       Mr. Verma was continuing to do some things.  And the date on

6       the other form was September.  I don't think Ms. Verma is

7       really in the picture in September.  But it's -- I think it's

8       clear that the active role in the conspiracy, not in a legal,

9       you know, withdrawal sense, but those affirmative steps, and

10      I don't hear the government arguing otherwise, is 2010.

11              And so that kind of takes us to where we are here.

12      I will say, on the presentence report, I don't -- I don't

13      think there is any question -- and, Judge, if you're

14      concerned about it, I'll address it.  I don't think there was

15      any intentional omission of USI from the discussions with

16      probation.  I mean, that was obviously central to the case.

17      It's all over the probation report.  I think just in

18      describing employment that was one of -- sort of how it got

19      listed.  I know there was the discussion with Mr. Freeze

20      that, you know, he was well aware she had this business, US

21      International.  So I really don't think that's an omission in

22      any way.

23              It's true that Ms. Verma exercised her right to go

24      to trial, and obviously the guidelines do give defendants a

25      bump up for pleading guilty and accepting responsibility,

1    but -- pleas are important, but I do think it's important

2    that there are trials, and I do think if, in the case where a

3    probationary sentence is otherwise appropriate, the idea that

4    going to trial will disqualify a defendant from that would be

5    troublesome.

6              THE COURT:  You really are talking about acceptance

7    of responsibility.

8              MR. SMITH:  Well, I know, Judge, and that is

9    important.  I will point out that Ms. Verma did not take the

10   stand at trial.  I think she is going to address your Honor.

11   And, you know, I just don't think that putting the government

12   to its burden of proof, while it's a relevant factor, is

13   something where we can say, well, we're just not going to

14   consider a sentence of probation.

15             In terms of general deterrence, I think whatever

16   your Honor chooses to do as to Ms. Verma, the headline here

17   is going to be:  Company convicted, 78-year-old man sent to

18   prison.  And no period of incarceration for Ms. Verma I think

19   is going to incrementally increase deterrence here.  I mean,

20   daughter getting charged and convicted, along with founder of

21   the company going to prison and company being convicted, and

22   let's not forget in the business world that actually matters.

23   We're not thinking of it as a significant sentence here.  But

24   I just don't think that adding an incarcerative sentence onto

25   Ms. Verma will really impact general deterrence.  And I

1    think, as your Honor pointed out, I don't think general

2    deterrence, and it's one factor and in and of itself

3    shouldn't overwhelm everything else in terms of a custodial

4    sentence.

5         We did cite the *Tsai* case in the sentencing

6    memorandum where there was a father and son duo, and the

7    son -- again, a plea, but ended up with a non-custodial

8    sentence, where there was some fairly serious conduct there.

9    The father was involved and had been designated for having

10   helped the North Koreans with their weapons program.  And the

11   father and son were found to have worked to evade that and

12   get a two-year sentence for the father and a non-custodial

13   sentence for the son.

14        Judge, so we have -- Ms. Ambrosio touched upon the

15   protracted nature of the investigation here yesterday during

16   Mr. Verma's sentence in terms of making the point that, when

17   you had a search, an interview of Mr. Verma in 2005, and then

18   another search in 2010, and a charge in 2015, that was a

19   little intention with the government's arguments about the

20   significance of the parts at issue here.  I'm bringing up the

21   temporal aspect right now for a slightly different reason.

22        You have that protracted period from, really, the

23   events that are the core of the government's case against

24   Ms. Verma and then charges being brought five years later,

25   essentially, and a fairly protracted prosecution in this

1    case.  And much of it, I think all of it really not for

2    reasons having to do with Ms. Verma, in terms of -- you know,

3    just issues with discovery, and the like.

4             So in sentencing Ms. Verma, I think it's both

5    relevant that we're talking about conduct that is several

6    years old.

7             THE COURT:  True.

8             MR. SMITH:  And also, Judge, that the court has --

9    you know, this is not a situation, for example, where if the

10   government had brought charges shortly after that search you

11   would say, well, what is this person?  Were they going to

12   forge ahead?  What were they going to do?  You have the

13   benefit of observing Ms. Verma both, you know, from that

14   five-year period, but also during the three years she has

15   been on supervised release in this case.  And she has

16   complied with supervised release.

17            But more than that, I mean, she is not only a

18   different person, I mean, no one changes into a completely

19   new person, but she is a different person, an evolved person,

20   from the person she was in 2010.  She has evolved as a person

21   from the person she was in 2015.  And I think the letters

22   that were submitted to your Honor in support of Ms. Verma

23   speak to a core goodness and generosity that was there within

24   her beforehand and suggested an ability to look outside

25   herself beyond what was going on with the family business.

1    But I think you also have now the ability to look
2    at her conduct over the past three years.  She did manage to
3    get her journalism degree from Northwestern.  I put a
4    relatively large sample of Ms. Verma's articles as an exhibit
5    to the sentencing memorandum, Judge.  Not on the assumption
6    you would read each and every one, although, you know,
7    they're all interesting, it was more to show that this was
8    not, you know, something pursued in the spirit of a dilatant.
9    Ms. Verma has tried, I think, to turn her life in a positive
10   direction.  She is going to have a felony conviction now.
11   She is 43 years old, and, in essence, working to restart her
12   life.  And I know it sounds like words on a page when we say
13   that a conviction is serious punishment, but she is -- you
14   know, assuming that she lives a reasonably long life, that's
15   something that will impact her for the next, you know, take
16   your pick, 40 years.  And she is going to have to negotiate
17   the limits of that.  And I think it's fair in considering and
18   appropriate in considering the Section 3553(a) factors to
19   look at what's -- what's an incarcerative sentence going to
20   do here?  Are we going to interrupt that progress.  And a
21   four-year term of probation is not nothing, Judge, especially
22   when you look at the passage of time that we've been dealing
23   with.  If the court were to follow probation's recommendation
24   and impose a four-year term of probation, at that point, at
25   the end of that, Ms. Verma will have been under the

1   supervision of either pretrial or probation for

2   seven-and-a-half years.

3           And, Judge, you know, in the overall scheme of this

4   case, visiting a prison sentence on Ms. Verma for conduct

5   that really the focus of which was -- you know, we can

6   quibble about months, or whatever, but we're talking about

7   2008, 2000 time period, where no one suggests that Ms. Verma

8   would have been involved in this but-for her father, where no

9   one suggests that she is a risk to recidivate, is greater

10  than necessary to serve the purposes of 3553(a).

11          THE COURT:  I would like you to comment on -- I'm

12  not sure where it was -- this idea that she is estranged from

13  her father because she is mad at her father because her

14  father wouldn't go to trial.

15          MR. SMITH:  I -- I will -- no, I don't think that's

16  my understanding of the dynamic here.  And I think -- I

17  think -- and this is -- I'm partly talking from my

18  observations, Judge.  I just think from before this case was

19  charged, and certainly with the charging of this case, there

20  has been a need to get separation from her father.  And, you

21  know, from what I've observed, that separation and distance

22  is -- pre-dates any decision about pleading or not pleading.

23  This isn't a recent development.

24          THE COURT:  I'm not sure where that --

25          MR. SMITH:  Or I'm not sure how the actual quote

1    came out in the PSR.

2              THE COURT:  -- came from.  I mean, there are lots

3    of reasons why I could understand an estrangement, a

4    particular one, if true --

5              MR. SMITH:  I don't know if there is a statement --

6              THE COURT:  -- doesn't go very far towards --

7              MR. SMITH:  -- that came out awkwardly in the PSR.

8    I can tell you, I don't think that's at all the dynamic here.

9    And I don't think anyone is suggesting that, you know,

10   they're getting the band back together, so to speak.  I mean,

11   this, I think, is a larger life story about changing the

12   patterns and associations that brought her to this point

13   beforehand, Judge.

14             And, Judge, unless the court has any questions, I

15   do know that Ms. Verma wants to address the court.

16             THE COURT:  All right.

17             THE DEFENDANT:  Your Honor, I wanted to say that I

18   am truly sorry to the court, to the government, and the

19   United States, and I accept full responsibility for my

20   actions.  I struggled very much, I know that, in the eyes of

21   most people, a woman of the age of 30 or of -- an adult woman

22   should be able to have courage, have strength to overcome

23   familial dynamics, but I -- I may had not have struggled in

24   other facets of my life, but I did struggle in separating in

25   making my own decisions than those of my family, especially

1    my father.  Being the eldest child, there is a 14-year gap

2    between me and my youngest sister.  And I saw my father make

3    immense sacrifices, or at least what I perceived to be

4    immense sacrifices, growing up from the time where we lived

5    when we first started, to us migrating to the United States.

6    I always revered him.  I respected him.  I thought, to me, he

7    was my dad.  I thought he could never do anything wrong.  And

8    standing up to him was the hardest thing I have ever had to

9    do in my life to date.  I can honestly say that.  But,

10   unfortunately, by the time I gathered the courage to stand up

11   to him and -- in mid of 2010, a lot of the damage was already

12   done in regards to the business and how it ended up hurting

13   me.

14            I know that no matter what I say I cannot go back

15   and make things right.  And I know that I can't make things

16   right with the government.  And, more importantly, I know I

17   can't make things right with myself.  And I know my actions

18   were unlawful, but they were not motivated with any

19   maliciousness.  I never would ever hurt the public, the

20   United States, the government.  I'm just -- that was just --

21   I could never even think that my actions would lead to

22   something like that.

23            I've been a citizen in this country, I came to this

24   country when I was seven years old, and I have grown up here

25   my whole life.  And I love the United States.  I would

1   never -- I wouldn't even hurt anybody, much less a public, or

2   a country, or a nation.

3           It has been more than -- it has been more than

4   eight years now since I closed my business, and I am no

5   longer the person who made my decisions -- or, you know,

6   previously I made decisions based on views and assurances and

7   promises by other people.  And I'm not that way anymore.

8   Today I am someone who is empowered.  I take my own

9   decisions.  I feel that even the career that I chosen to

10  pursue, it requires me to be thorough, it requires me to be a

11  fact-checker, to be careful, to be self-reliant.  These were

12  all qualities that I did not exercise before, and I clearly

13  recognize that.

14          During the course of this case, it has stretched on

15  for a very, very long time.  And from the time when even --

16  even before that, from when 2010 -- actually began since

17  then.  So like eight -- since eight -- go back eight years.

18  Since this all started for me, I have lost everything.  I was

19  married.  And, again, when I look back upon the, you know,

20  what went into my decision-making process of who to marry, it

21  was influenced a lot by what would work for my cultural

22  background, let me put it to you that way, my familial

23  background, like who would fit into it.  That's how I lived

24  my life.

25          But my marriage didn't last.  And, you know, I

1  guess there is something to be learned just in that, that

2  maybe -- that that was too a lesson for me.  And I believe

3  strongly that part of the reason is this case had a huge

4  impact on it.

5          I've lost friends, career opportunities, but more

6  importantly than everything -- and I think that some of the

7  things, because they happened earlier a little bit less

8  impact-ful to me now, but most importantly I lost the respect

9  of the community that I worked so hard to build.  You know,

10  within the community, I think that I always tried my best to

11  promote my culture, be involved in different kinds of ways,

12  be involved in programs, in projects.  And that was something

13  that I felt very good about as a person to be able to do

14  that.  And it definitely limited -- this whole process

15  limited for me from being -- to socialize and to being

16  involved in a way that I would have liked to.

17          I understand that, out of what I've experienced,

18  that definitely breaking the law has a very important impact

19  on your life.  It's a devastating impact on you and others.

20  And I can say -- I think it's fair for me to say that

21  sometimes in life the worst experiences teach you the most

22  valuable lessons.  And I absolutely shall never repeat

23  another unlawful action again.

24          Today, when I leave this courtroom, in the eyes of

25  the law and the world, I am a convicted felon.  And I know

1    that I will carry the stigma, the weight of this conviction

2    with me for the rest of my life.  And I know that the

3    conviction, the shame and its impact, will probably stay with

4    me -- not probably, definitely stay with me, probably until I

5    die.

6              But I have to say that, despite the weight of this

7    case and while the case was going on, I somehow managed to

8    get my -- earn my degree at Medill, for which I am grateful.

9    And I have to say that I worked hard to rebuild a new life, a

10   new career.

11             And I want to actually thank Mr. Haxall for

12   allowing me to go to Israel, and the court, but for allowing

13   me to go to Israel and pursue what I loved to do.  I got the

14   opportunity to do an internship there, and I -- I cannot tell

15   you how meaningful that was to me, especially at the place in

16   my life that I was at at that time.  It was very delicate

17   time for me, and I am grateful for that.

18             This conviction has limited my job opportunities

19   and my income, but I have managed to gain employment as a

20   freelance journalist.  And I hope that the court would

21   consider exercising leniency so that I can continue to work

22   and support myself.

23             I know that I have done wrong.  I know that I have

24   erred.  And I hope that, you know, as much as I have erred, I

25   hope that the court would give me an opportunity to rebuild

1    my life again.  And this time I plan to live my life on my

2    terms and sustain it in my -- on my terms.  And I just ask,

3    and I beg, and I plead the court for the opportunity to do

4    that so that I can have -- so I can at least have a second

5    chance and, you know, correct so many of the wrongs that I

6    did create.  I want to have -- I want to be able to correct

7    this wrong and make it into a right, and I hope that I am

8    given that opportunity to do so.

9              THE COURT:  All right.  Thank you.

10             All right.  Let's turn to 3553.  Let's talk about

11   the nature and circumstances of the offense.  I mean, this

12   conspiracy did go on a long time.  Potential to harm the

13   United States is there, not -- I've never been very convinced

14   about -- that there were any national security concerns here.

15   And I'm not sure if that was the best way to -- thing to

16   emphasize, but I -- certainly there was long-term fraud, and

17   there was certainly the potential for products that weren't

18   satisfactory, and, of course, no way to trace that when where

19   they're actually coming from is being hidden.

20             I can understand the frustration the government

21   must feel in cases like this because it's a huge amount of

22   work to prosecute them.  And stopping fraud against the

23   United States, really at all, let alone in anything having to

24   do with the military, is very -- it's very important, and

25   they need to do it.

1    The history and characteristics, that's where we
2    get to one that I think this -- I -- I don't like the
3    argument, which you didn't make so much as your father did,
4    that, well, I was a poor immigrant, and I came here, and this
5    is the way I brought myself up from poverty.  Well, I know
6    immigrants.  Themselves or their families came here, and they
7    didn't do it that way.  And I just don't accept that as an
8    excuse.  It just feeds into anti-immigrant bias by that kind
9    of argument.

10   But the family.  I do think there is a -- despite
11   the fact that you were in your 30s when you were doing this,
12   I think it is a significant mitigating factor here.  You've
13   got your father, you've got your mother.  This is, I'm sorry,
14   but was really a major mindset of -- to what, to our mind,
15   the laws of the United States, was a corrupt way of dealing.
16   So I suppose it's not terribly surprising that you would end
17   up as part of it, and not, despite your own education and
18   intelligence, maybe see it as to what it was.

19   There has been a long time -- it has been a long
20   time since this occurred.  And while at least until right now
21   I have not seen signs, to me, in terms of observing you, of
22   remorse, you have certainly turned your life, apparently,
23   around, and, indeed, the government doesn't think that there
24   is a need to protect the public from further criminal
25   behavior on your part.

1    There is the issue of adequate general deterrence,

2    and there is a need for the sentence to reflect the

3    seriousness of this offense and promote respect for the law

4    and provide just punishment.  And then I'm to impose a

5    sentence that's sufficient but not greater than necessary.

6    So, in the end, I agree largely with probation, and

7    I am going to impose a sentence of four years of probation,

8    but I'm also going to impose a significant fine.  I think

9    with your education and your possibilities and your age that

10   you should be able to pay it.  And I think that will be

11   significant punishment.  So I am imposing a fine of $70,000

12   and special assessment of $100.

13   MR. SMITH:  I'm sorry, Judge, I just didn't hear

14   the number.  Was it 1-7 or 7-0?

15   THE COURT:  7-0.  I looked at what's in her bank

16   account, I look at her education, I look at how young she is,

17   I look at the possibilities, and I think it makes more sense

18   than incarceration, but that it's still punishment which will

19   send some message of general deterrence, as well as punish

20   the particular offenses here.

21   There are conditions of probation that were

22   attached to the government -- or, well, actually, to the

23   probation office's recommendation.  Were there -- are there

24   any of those that you think are not appropriate to successful

25   probation integration -- continued integration in society?

1      MR. SMITH:  Judge, I don't believe so, and I did go

2   over them with Ms. Verma.  But if I could just have a moment

3   to have one last look, just to --

4      THE COURT:  Yes, you may.

5      MR. SMITH:  Judge, I think those all look

6   appropriate.

7      MS. MACARTHUR:  Judge, I agree as well.  I just

8   wanted to add as a caveat that yesterday we discussed an

9   additional sentence to the debarment paragraph.

10      THE COURT:  Oh, right.

11      MS. MACARTHUR:  I have given it to your Honor.

12   We're not necessarily lobbying for it here.  We had included

13   it in our sentencing submission.  I just wanted to note, at

14   least allow there to be some discussion as to whether we

15   should add it here.  And that sentence was, in addition to

16   the debarment:  Defendant shall not knowingly enter into a

17   contract for which the solicitation was made by the defense

18   logistics agency or any branch of the United States military,

19   or for which a component of the Department of Defense is the

20   end user, unless the Secretary of Defense determines a waiver

21   is in the interest of national security.

22      Now, on the one hand, that goes hand in hand with

23   the debarment.  On the other hand, we recognize too that the

24   likely of Ms. Verma going back into this area is much less

25   than her father, and that's why it's a soft presentation by

1    me to your Honor.  But just to let you know that we included

2    that with Mr. Verma.

3              THE COURT:  I think I would agree with what, your

4    underlying statement there that you think that she is not

5    likely to go back into that during the term of her probation,

6    so I think it's not necessary.  And it doesn't sound like

7    you're really arguing that it -- that you think that we

8    really need it.

9              MS. MACARTHUR:  I think that's a fair assessment,

10   your Honor.  Thank you.

11             THE COURT:  All right.  We'll leave out the extra

12   words, then.

13             All right.  You shall not commit another federal,

14   state or local crime during the term of probation.

15             I'm not sure what the next thing was.  The way it's

16   written, I don't understand.

17             You shall not unlawfully possess a controlled

18   substance.  You shall refrain from any unlawful use of a

19   controlled substance.  Do we have any reason to think -- is

20   there any use whatsoever?  Do you think it's necessary here?

21             MS. MACARTHUR:  The report indicated some at an

22   earlier point in time, Judge, but also reflected that

23   Ms. Verma has stopped using alcohol.  And she tested positive

24   for marijuana usage, I think up until 2015, or, I'm sorry --

25             THE COURT:  Well, in that case --

1          MS. MACARTHUR:  But hasn't since then.  So it's a

2     mixed bag, but an older picture.

3          MR. SMITH:  And just to be clear, Judge, I think,

4     and I don't think Ms. MacArthur is arguing to the contrary.

5     I think that was essentially residual from pre -- those were

6     her initial drops.  There has been no violation of --

7          THE COURT:  All right.  I just want to know whether

8     to include -- well, it says mandatory condition, but I think

9     we can leave it -- it can be left out.  Should I put in No. 5

10    or not?

11         PROBATION OFFICER:  Judge, you do have the

12    authority to modify that or --

13         THE COURT:  Just tell me.

14         PROBATION OFFICER:  It's up to your discretion,

15    Judge.  It is mandatory, unless you decide --

16         THE COURT:  All right, we'll leave it in.  But

17    unless there is some reason to think that -- I mean,

18    obviously it says, "and up to."

19         So you shall refrain from any unlawful use of a

20    controlled substance and submit to one drug test within

21    15 days of your release on probation and up to 104 periodic

22    tests thereafter for use of a controlled substance.

23         You shall notify the court of any material change

24    in your economic circumstances that might affect your ability

25    to pay your fine and special assessment.

1      You shall cooperate in the collection of a DNA
2   sample, if that is required by law.

3      You shall pay the fine that I have imposed.

4      You shall seek and work conscientiously at lawful
5   employment or pursue conscientiously a course of study or
6   vocational training that will equip you for employment.

7      You shall be debarred from entering into contracts
8   with the Department of Defense pursuant to 10 USC Section
9   2408, unless the Secretary of Defense determines a waiver is
10  in the interest of the national security.

11     You shall refrain from knowingly meeting or
12  communicating with any person whom you know to be engaged or
13  planning to be engaged in criminal activity.

14     You shall refrain from excessive use of alcohol
15  defined as having a blood alcohol concentration greater than
16  .08 percent.

17     You shall refrain from possessing a firearm,
18  destructive device or other dangerous weapon.

19     You shall work in community service for 400 hours
20  as directed by probation.

21     You shall remain in the jurisdiction where you are
22  being supervised, unless granted permission to leave by the
23  court or a probation officer.

24     You shall report to a probation officer as directed
25  by the court or a probation officer.

1      You shall permit a probation officer to visit you
2  at any reasonable time as specified, at home, work or
3  community service location or other reasonable locations
4  specified by a probation officer.

5      You shall permit confiscation of any contraband
6  observed in plain view of the probation officer.

7      You shall notify a probation officer promptly
8  within 72 hours of any change in your residence, employer or
9  work place; and absent constitutional or other legal
10  privilege, answer inquiries by a probation officer.

11      You shall notify a probation officer promptly
12  within 72 hours if you are arrested or questioned by a law
13  enforcement officer.

14      You shall not incur new credit charges or open
15  additional lines of credit without the approval of a
16  probation officer, unless you are in compliance with the
17  financial obligations imposed by this judgment.

18      You shall provide a probation officer with access
19  to any requested financial information necessary to monitor
20  compliance with other conditions of probation.

21      You shall notify the court of any material change
22  in your economic circumstances that might affect your ability
23  to pay your fine or special assessment.  That was already
24  stated up above.

25      You shall provide documentation to the IRS and pay

54

1    taxes as required by law.

2            You shall pay the financial penalty imposed by this

3    judgment which shall be in an amount of at least ten percent

4    of your net monthly income defined as income net of

5    reasonable expenses for basic necessities, such as food,

6    shelter, utilities, insurance and employment-related

7    expenses.

8            You shall not enter into any agreement to act as an

9    informer or special agent of a law enforcement agency without

10   the permission of the court.

11           MR. SMITH:  Judge, may I just ask?  I'm sorry to

12   interrupt.  I had, as much a clarification for me, on one of

13   the discretionary conditions.  It may be a Mr.-Freeze-type

14   question, but for Ms. Verma's employment, assuming she is

15   able to continue that, I think there would be regular travel.

16   And I know there is the condition about remaining in the

17   jurisdiction where you're being supervised, unless granted

18   permission to leave.  I take it that's just a requirement, as

19   opposed to court permission to consult with probation.

20           THE COURT:  Well, I certainly don't want to be

21   monitoring it for the next --

22           MR. SMITH:  Well, that's my --

23           THE COURT:  -- four years.  But probation I

24   think -- what does it need to say?

25           MR. SMITH:  This is No. 14.

1    PROBATION OFFICER:  Judge, it's an "or."  Court or

2    the probation officer, so.

3    MR. SMITH:  Oh, okay.

4    THE COURT:  Or a probation officer.  So, I mean, if

5    somehow there was a conflict, that's when these things come

6    back, and we'll deal with it then.

7    MR. SMITH:  Very good.

8    PROBATION OFFICER:  Judge, I just have one

9    question, or note.  I'm not sure, Judge, you read in the

10    second part of Discretionary Condition 7, that, in addition

11    to the alcohol, there is the prohibition --

12    THE COURT:  I didn't because I thought I was just

13    repeating myself.  Or was I not?  I mean, we had already put

14    up there the -- but I can add that.

15    Greater than .08 percent, or you shall refrain from

16    any use of a narcotic drug or other controlled substance as

17    defined in Section 102 of the Controlled Substances Act

18    without a prescription by a licensed medical practitioner.

19    PROBATION OFFICER:  Thank you, Judge.

20    THE COURT:  Did I miss anything else?

21    MS. MACARTHUR:  Judge, I apologize, but I'm not

22    sure if your Honor referred to a special assessment.

23    THE COURT:  I did.

24    MS. MACARTHUR:  Thank you, Judge.

25    THE COURT: Oh, that's right, it would just -- I

1       mean, what they said here was $100.  It was one count; right?

2                   MS. MACARTHUR:  Yes, your Honor.

3                   THE COURT:  Okay.  You do have 14 days to file a

4       notice of appeal.

5                   I think you've lived in a difficult situation in

6       terms of family, but as you have recognized, it's time to be

7       your own person and to live according to the laws and rules

8       that you know are appropriate.  So I trust that you will end

9       up being the example.  Thank you.

10                  MR. SMITH:  Thank you, your Honor.

11                  MS. MACARTHUR:  Your Honor, just one housekeeping

12      matter.

13                  THE COURT:  What did I miss?

14                  MS. MACARTHUR:  Nothing that your Honor missed.  We

15      just move to dismiss the original indictment as to Ms. Verma,

16      it's the superseding indictment that she was --

17                  THE COURT:  Okay.

18                  MR. SMITH:  And, Judge, while we are at that, I

19      also believe it would be appropriate to dismiss the

20      forfeiture allegation from the superseding indictment, since

21      the government has not pursued forfeiture as to Ms. Verma.

22                  MS. MACARTHUR:  That's correct, your Honor.

23                  THE COURT:  Yes, we'll do that.

24                  MS. MACARTHUR:  Thank you.

25                  MR. SMITH:  Thank you, Judge.

1              THE COURT:  Hopefully you've got everything, you

2    won't need to come back.  Thank you.

3           (Which were all the proceedings heard.)

4                    CERTIFICATE

5           I certify that the foregoing is a correct transcript

6    from the record of proceedings in the above-entitled matter.

7

8    */s/ SANDRA M. MULLIN*_____         May 7, 2019

9    SANDRA M. MULLIN, CSR, RMR, FCRR
       Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25